## FORM 1.997. CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I.    CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>THIRTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>HILLSBOROUGH</u>   COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>Creative Choice Homes XXX, LLC</u>
 Plaintiff
        vs.
<u>Amtax Holdings 690, LLC</u>
Defendant

---

**II.    TYPE OF CASE**

- ☐ Condominium
- ☐ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect
  - ☐ Mass tort
  - ☐ Negligent security
  - ☐ Nursing home negligence
  - ☐ Premises liability – commercial
  - ☐ Premises liability – residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
  - ☐ Commercial foreclosure $0 - $50,000
  - ☐ Commercial foreclosure $50,001 - $249,999
  - ☐ Commercial foreclosure $250,000 or more
  - ☐ Homestead residential foreclosure $0 – 50,000
  - ☐ Homestead residential foreclosure $50,001 - $249,999
  - ☐ Homestead residential foreclosure $250,000 or more
  - ☐ Non-homestead residential foreclosure $0 - $50,000
  - ☐ Non-homestead residential foreclosure $50,001 - $249,999

- ☐ Non-homestead residential foreclosure $250,00 or more
- ☐ Other real property actions $0 - $50,000
- ☐ Other real property actions $50,001 - $249,999
- ☐ Other real property actions $250,000 or more

- ☐ Professional malpractice
  - ☐ Malpractice – business
  - ☐ Malpractice – medical
  - ☐ Malpractice – other professional
- ☒ Other
  - ☐ Antitrust/Trade Regulation
  - ☒ Business Transaction
  - ☐ Circuit Civil - Not Applicable
  - ☐ Constitutional challenge-statute or ordinance
  - ☐ Constitutional challenge-proposed amendment
  - ☐ Corporate Trusts
  - ☐ Discrimination-employment or other
  - ☐ Insurance claims
  - ☐ Intellectual property
  - ☐ Libel/Slander
  - ☐ Shareholder derivative action
  - ☐ Securities litigation
  - ☐ Trade secrets
  - ☐ Trust litigation

**Composite Exhibit B**

### COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**III.** **REMEDIES SOUGHT** (check all that apply):
- ☒ Monetary;
- ☒ Non-monetary declaratory or injunctive relief;
- ☐ Punitive

**IV.** **NUMBER OF CAUSES OF ACTION: (    )**
(Specify)

<u>2</u>

**V.** **IS THIS CASE A CLASS ACTION LAWSUIT?**
- ☐ Yes
- ☒ No

**VI.** **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
- ☒ No
- ☐ Yes – If "yes" list all related cases by name, case number and court:

**VII.** **IS JURY TRIAL DEMANDED IN COMPLAINT?**
- ☐ Yes
- ☒ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature <u>s/ Scott A McLaren</u>        FL Bar No.: <u>414816</u>
    Attorney or party                                                    (Bar number, if attorney)

<u>Scott A McLaren</u>        <u>07/05/2019</u>
    (Type or print name)                                              Date

## BUSINESS COURT ADDENDUM

### Party or Attorney Filing Action Must Place an "X" in One of the Boxes Below

The categories of cases set out below shall guide the parties and the Court in the designation of cases for the Business Court.

☑ A.  Internal affairs or governance; dissolution or liquidation rights; obligations between or among owners (shareholders, partners, members); or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of corporations, partnerships, limited partnerships, limited liability companies or partnerships;

☐ B.  Trade secrets and non-compete agreements;

☐ C.  Intellectual property;

☐ D.  Securities or state securities laws;

☐ E.  Antitrust statutes;

☐ F.  Shareholder derivative actions and related class actions;

☐ G.  Corporate trust affairs or director and officer liability;

☐ H.  Non-consumer UCC-related transactions;

☐ I.  Purchases and sales of businesses or the assets of a business; and

☐ J.  Franchisee/franchisor relationships and liabilities

*NOTE:* **A copy of the Civil Cover Sheet and this Addendum must be served with the Complaint for all Business Court cases. See Administrative Order S-2013-021 for further Business Court requirements.**

Print Form

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

CREATIVE CHOICE HOMES XXX, LLC f/k/a
Creative Choice Homes XXX, Inc.,
a Florida limited liability company,

      Plaintiff,

                                                           Case No.:

v.

AMTAX HOLDINGS 690, LLC, a foreign limited
liability company, and PROTECH 2005-C, LLC,
a foreign limited liability company,

      Defendants.

_____/

## REQUEST FOR DIVISION ASSIGNMENT

      This is a request based on local Administrative Order(s) for the Clerk of the Court to assign the above styled case in the:

☒      Tampa Division

☐      East Division

☐      Prior Division (Please indicate Case Number and Division of previously filed action: ___ )

      I understand that the actual division assignment will be in accordance with the Hillsborough County Administrative Orders. If there is no supported request for specific division assignment, this action will be assigned a division based on a random and equitable distribution system.

| | |
|---|---|
| **Name of Attorney:** | Scott A. McLaren, Esq. |
| **Address:** | 101 E. Kennedy Blvd., Suite 3700, Tampa, Florida 33602 |
| **Phone Number:** | 813-221-3900 |
| **Email Address(es):** | scott.mclaren@hwhlaw.com and alison.diehl@hwhlaw.com and relit.samcla@hwhlaw.com |

12804736v1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

CREATIVE CHOICE HOMES XXX, LLC f/k/a
Creative Choice Homes XXX, Inc.,
a Florida limited liability company,

      Plaintiff,

                                    Case No.:

v.

AMTAX HOLDINGS 690, LLC, a foreign limited
liability company, and PROTECH 2005-C, LLC,
a foreign limited liability company,

      Defendants.

_____/

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, CREATIVE CHOICE HOMES XXX, LLC, f/k/a Creative Choice Homes XXX, Inc., a Florida limited liability company, hereby sues Defendants, AMTAX HOLDINGS 690, LLC, a foreign limited liability company, and PROTECH 2005-C, LLC, a foreign limited liability company, and alleges the following:

### Parties, Jurisdiction, and Venue

1. Plaintiff Creative Choice Homes XXX, LLC f/k/a Creative Choice Homes XXX, Inc. ("Creative Choice") is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, which is registered to do business in the State of Florida and at all materials times has conducted business in the State of Florida.

2. Defendant Amtax Holdings 690, LLC ("Amtax") is an Ohio limited liability company that has engaged in business in Hillsborough County at all material times hereto. Amtax engages in a business or business venture in Florida by virtue of the partnership agreement described

herein, and is therefore subject to the jurisdiction of this Court pursuant to Florida Statute § 48.193(1)(a)(1).

3. Defendant Protech 2005-C, LLC ("Protech") is an Ohio limited liability company that has engaged in business in Hillsborough County at all material times hereto. Protech engages in a business or business venture in Florida by virtue of the partnership agreement described herein, and is therefore subject to the jurisdiction of this Court pursuant to Florida Statute § 48.193(1)(a)(1).

4. This Court has subject matter jurisdiction because this is action seeking declaratory relief and damages in excess of $15,000, exclusive of interest, costs, and attorneys' fees.

5. Venue is proper in this Court because the agreement on which this action is based—the Amended and Restated Agreement of Limited Partnership ("Partnership Agreement")—contains a Hillsborough County venue selection clause. (Partnership Agreement, §16.10). A copy of the Partnership Agreement is attached hereto as **Exhibit "A."** Further, the causes of action alleged herein accrued in Hillsborough County.

**General Allegations**

6. Creative Choice and Defendants are parties to a Florida limited partnership called Creative Choice Homes XXX, Ltd. (the "Partnership"). The Partnership was formed in 2002 for the purpose of developing and operating a low-income housing project in Tampa, Florida (the "Project"). The Project has 132 units and provides low-income housing to approximately 330 residents.

7. The Partnership was initially formed with Creative Choice Homes XXX, Inc. as General Partner, and Dilip Barot as the Original Limited Partner.

2

8. On or about December 21, 2005, the partners entered into the Partnership Agreement. Pursuant to the Partnership Agreement, Dilip Barot withdrew as the Original Limited Partner. Moreover, Protech 2005-C, LLC was admitted to the Partnership as the Special Limited Partner; and Amtax Holdings 690, LLC was admitted to the Partnership as the Investor Limited Partner. The Partnership Agreement provides that the Partnership shall continue until December 31, 2065 unless sooner dissolved. (Partnership Agreement, §1.5)

9. On or about May 11, 2012, General Partner Creative Choice Homes XXX, Inc. converted to Creative Choice Homes XXX, LLC pursuant to the Certificate of Conversion attached hereto as **Exhibit "B."**

10. Accordingly, the Partnership currently consists of Creative Choice as the General Partner; Defendant Amtax as the Investor Limited Partner; and Defendant Protech as the Special Limited Partner.

11. As the General Partner, Creative Choice is responsible for, among other things, overseeing the overall management and operations of the Project, and ensuring the Project remains in tax credit compliance for federal tax credits and provides safe and affordable housing to qualified residents with below area median income. Creative Choice has an office of employees at the Project who have always handled the day-to-day affairs of the Project and dealings with tenants.

12. For over a decade, Creative Choice or its representatives have acted as the General Partner for the Project and, together with Defendants, have operated a successful Partnership with a conflict-free relationship.

3

13. However, in April 2019, Defendants suddenly began expressing "concerns" with Creative Choice's management of the Partnership and ability to carry out its duties and obligations as General Partner.

14. On May 3, 2019, Defendants sent correspondence to Creative Choice declaring a material default of the Partnership Agreement and their intent to remove Creative Choice as General Partner. A true and correct copy of the May 3, 2019 correspondence is attached hereto as **Exhibit "C."**

15. In the letter, Defendants allege that Creative Choice has misused Partnership funds, made distributions "out of order," and failed to provide audited financial statements, all constituting a default under the Partnership Agreement warranting removal of Creative Choice as General Partner. Defendants stated that Creative Choice would have 30 days to cure the alleged defaults under the terms of the Partnership Agreement.

16. These allegations came as a complete surprise to Creative Choice because Defendants have historically always reviewed and approved all financial statements, and prior to this time never raised any issue or concern regarding Creative Choice's management and operation of the Project, or any distributions made in that role.

17. Notwithstanding, Creative Choice immediately began investigating the allegations to see whether any of the stated concerns needed to be remediated.

18. Upon a thorough investigation, Creative Choice determined that as a result of unintentional administrative mistakes made by its Comptroller, funds had been mistakenly advanced out of order in accordance with the distribution provisions of the Partnership Agreement, which requires the limited partners to receive certain distributions before the General Partner or its affiliates.

4

19. Upon discovering the Comptroller's mistakes, Creative Choice notified Defendants that it would send corrective payments to remediate any underpayments based on the out-of-order distributions, and sent draft audited financial statements on June 3, 2019.

20. In addition, Creative Choice has removed the Comptroller from all accounting activities for all projects, and revoked his access to any accounts or funds. Further, Creative Choice has hired a new Comptroller, and has put procedures in place to ensure no issues reoccur, including a procedure whereby certain approvals are required before any distribution of Partnership funds can be made.

21. Despite Creative Choice's efforts in this regard, Defendants refused to communicate directly with Creative Choice, refused to advise whether such curative efforts were acceptable to Defendants, and if not, what Defendants believed were the additional steps necessary to cure the perceived defaults. Creative Choice even offered Defendants an opportunity to be part of the process of overseeing and implementing changes to avoid future concerns. However, Defendants rejected these offers and continued to vaguely maintain that the curative efforts were not sufficient.

22. Instead of openly communicating with Creative Choice in an effort to resolve any outstanding issues, Defendants abruptly and without warning or authority to do so sent a Notice of Removal to Creative Choice dated June 18, 2019, in which they notified Creative Choice that its removal as General Partner would be effective June 20, 2019, and that Defendants would be entering the Project "to take control of the property and possession of all files and records." A true and correct copy of the June 18, 2019 Notice of Removal is attached hereto as **Exhibit "D."**

23. Although Creative Choice continued to attempt to address Defendants' perceived concerns, Defendants refused to accept any curative efforts from Creative Choice. Defendants

5

declared they were not interested in "unwinding" any of the stated defaults, and would proceed to remove Creative Choice as General Partner.

24. On June 21, 2019, representatives of Defendants entered the Project. They stated their presence was to "take over" the Project and began distributing letters to Creative Choice's employees of their claimed authority to do so.

25. Creative Choice disputed their authority to "take over" the Project, and after discussion Defendants' representatives left the Project.

26. Creative Choice's employees have expressed considerable concern over Defendants' actions at the Project, and continue to question whether their employment is in jeopardy.

27. Later on June 21, 2019, Creative Choice, as requested, furnished the draft audited financial documents to Defendants for their review and approval, and mailed a check that corrected any distribution issues raised in Defendants' correspondence. A true and correct copy of the furnished check is attached hereto as **Exhibit "E."** The amount of the check is based on the draft audited statements, which were prepared by an independent third-party accounting firm who calculated the amounts due to the limited partners.

28. Defendants accepted and cashed the check sent from Creative Choice, but to date continue to maintain their position that Creative Choice has materially defaulted under the Partnership Agreement and that its removal as General Partner is effective and has since occurred.

29. All conditions precedent to this action have occurred, been performed, or have been waived.

## Count I – Declaratory Judgment

30. Creative Choice realleges paragraphs 1 through 29 above as if fully set forth herein.

6

31. This is an action for declaratory relief under Chapter 86, Florida Statutes.

32. Defendants rely upon Sections 8.15(a)(i) and 8.15(a)(ii)(B) as grounds for default warranting the removal of Creative Choice as General Partner. (*See* Exhibit C).

33. Sections 8.15(a)(i) and 8.15(a)(ii)(B) state in pertinent part as follows:

> Section 8.15(a)(i): "for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)";

> Section 8.15(a)(ii)(B): if "the General Partner shall have violated any material provision of this Agreement . . . or violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)"

34. Moreover, Section 8.15(b) provides that the thirty-day cure period shall have "an added sixty (60) days if the General Partner begins to cure the default within the thirty (30) day period and diligently and continuously pursues the cure."

35. Finally, Section 8.15(b) also provides that the General Partner may be removed upon expiration of the applicable cure period "unless the General Partner within thirty (30) days of such notice contests such removal in a court of competent jurisdiction."

36. Creative Choice maintains that the "defaults" alleged by Defendants do not authorize removal of the General Partner because (i) they have not resulted in, and are not likely to result in, "a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership," and (ii) no conduct identified constitutes "intentional misconduct, malfeasance, fraud, an act outside the scope of [Creative Choice's] authority, breach of a fiduciary duty, or any failure to exercise reasonable care with respect to any material

7

matter." Therefore, Creative Choice is not in default of the Partnership Agreement and Defendants' June 18, 2019 Notice of Removal was null, void, and without effect.

37. Further, Creative Choice began to cure the alleged defaults within the 30-day period and diligently and continuously has pursued efforts to address all of Defendants' concerns. Therefore, although the original cure period expired June 3, 2019, per the terms of the Partnership Agreement, it was extended an additional 60 days and is still in effect until August 3, 2019. Therefore, for this reason as well, Defendants' June 18, 2019 Notice of Removal was null, void, and without effect.

38. In contrast, it is Defendants' position that the alleged defaults do authorize removal of Creative Choice as General Partner, and therefore the June 18, 2019 Notice of Removal was effective.

39. Further, although not specifically stated, it appears to be Defendants' position that the applicable cure period has not been extended to August 3, 2019.

40. Creative Choice is contesting Defendants' June 18, 2019 Notice of Removal within 30 days of such notice, and therefore any removal of Creative Choice as General Partner is of no force and effect unless and until the Court adjudicates the rights of the parties to the Partnership Agreement and the effect of the June 18, 2019 Notice of Removal.

41. Given this dispute, there exists a present controversy as to the rights of the parties concerning the Partnership Agreement and the effect of Defendants' June 18, 2019 Notice of Removal.

42. There is a bona fide, actual, and present need to resolve the controversy concerning the Partnership Agreement and the effect of Defendants' June 18, 2019 Notice of Removal.

43. The powers, privileges, and rights of the parties are dependent upon the facts presented, and the law applicable to the facts.

44. The parties to this declaratory action have an actual, present, adverse, and antagonistic interest in the subject matter of this declaratory action – in fact and in law.

45. Creative Choice's rights under the Partnership Agreement are dependent on whether Defendants have provided proper notice of the alleged defaults and the required opportunity to cure.

46. The antagonistic and adverse interests of and parties to this controversy are before this Court by proper process in this declaratory action.

47. The relief sought in this declaratory action is not the mere giving of legal advice by the Court or an answer to questions propounded from curiosity.

WHEREFORE, Plaintiff, Creative Choice Homes XXX, LLC, demands judgment in its favor and against Defendants declaring that (i) no circumstance authorizing removal of Creative Choice as General Partner exists as defined by the Partnership Agreement; (ii) the applicable cure period was extended an additional 60 days and remains in effect until August 3, 2019; (iii) Defendants' June 18, 2019 Notice of Removal was null, void, and without effect; (iv) awarding Creative Choice its attorneys' fees and costs incurred in this action pursuant to the Partnership Agreement, and (v) awarding such other relief as the Court deems just and proper.

### Count II – Breach of Partnership Agreement

48. Creative Choice realleges paragraphs 1 through 29 above as if fully set forth herein.

49. This is an action for breach of contract for damages in excess of $15,000, exclusive of interest, costs, and attorneys' fees.

50. The Partnership Agreement is a valid and enforceable contract.

9

51. Defendants rely upon Sections 8.15(a)(i) and 8.15(a)(ii)(B) as grounds for default warranting the removal of Creative Choice as General Partner. (*See* Exhibit C).

52. With respect to the removal of the General Partner, the Partnership Agreement states as in pertinent part as follows:

Section 8.15(a)(i): "for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)";

Section 8.15(a)(ii)(B): if "the General Partner shall have violated any material provision of this Agreement . . . or violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)"

53. Moreover, Section 8.15(b) provides that the 30-day cure period shall have "an added sixty (60) days if the General Partner begins to cure the default within the thirty (30) day period and diligently and continuously pursues the cure."

54. Finally, Section 8.15(b) also provides that the General Partner may be removed upon expiration of the applicable cure period "unless the General Partner within thirty (30) days of such notice contests such removal in a court of competent jurisdiction."

55. The alleged defaults have not resulted in, and are not likely to result in, "a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership", and (ii) no conduct identified constitutes "intentional misconduct, malfeasance, fraud, an act outside the scope of [Creative Choice's] authority, breach of a fiduciary duty, or any failure to exercise reasonable care with respect to any material matter."

10

56. Creative Choice began to cure the alleged defaults within the 30-day period, and has diligently and continuously pursued a cure, and thus the cure period was extended an additional 60 days until August 3, 2019.

57. Defendants materially breached the Partnership Agreement by purporting to remove Creative Choice as General Partner in the absence of any circumstance warranting removal of the General Partner under the Partnership Agreement, and given that the applicable cure period is still in effect.

58. Creative Choice has been damaged by Defendants' breach—including, among other things, Creative Choice's ability to operate its business and maintain its employees has been threatened and compromised; Creative Choice has been denied the opportunity to cure its alleged breaches and rectify its relationship with Defendants; Creative Choice is in danger of the Project losing its tax credit compliance that could cause the displacement of approximately 330 residents; and Creative Choice has suffered damage to its reputation and goodwill in the low income housing industry.

WHEREFORE, Plaintiff, Creative Choice Homes XXX, LLC, requests this Court to (i) award Creative Choice injunctive relief enjoining Defendants from continuing its efforts to remove Creative Choice as the General Partner; (ii) award Creative Choice injunctive relief by compelling Defendants' specific performance of its obligations under the Partnership Agreement, including its obligation to provide Creative Choice until August 3, 2019 to cure per the terms of that Agreement; (iii) enter a judgment finding Defendants breached the Partnership Agreement; (iv) find Creative Choice is entitled to damages as a result of Defendants' breach; (v) award Creative Choice its attorneys' fees and costs incurred in this action pursuant to the Partnership Agreement; and (iv) award such other relief as the Court deems just and proper.

11

Respectfully submitted this 5th day of July, 2019,

/s/*Scott A. McLaren*
Scott A. McLaren
Florida Bar No. 414816
scott.mclaren@hwhlaw.com;
alison.diehl@hwhlaw.com
Mark J. Criser
Florida Bar No. 141496
mark.criser@hwhlaw.com
terrina.mcdonald@hwhlaw.com
A. Evan Dix
Florida Bar No. 1003435
evan.dix@hwhlaw.com
terrina.mcdonald@hwhlaw.com
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Boulevard
Bank of America Plaza, Suite 3700
Tampa, Florida 33602
Telephone: (813) 221-3900
Facsimile: (813) 221-2900
*Attorneys for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

CREATIVE CHOICE HOMES XXX, LLC f/k/a
Creative Choice Homes XXX, Inc.,
a Florida limited liability company,

      Plaintiff,

                              Case No.:

v.

AMTAX HOLDINGS 690, LLC, a foreign limited
liability company, and PROTECH 2005-C, LLC,
a foreign limited liability company,

      Defendants.

_____/

## EXHIBIT "A"

## TO

## COMPLAINT

CREATIVE CHOICE HOMES XXX, LTD.,
A FLORIDA LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is made and entered into as of December 21, 2005, by and among CREATIVE CHOICE HOMES XXX, INC., a Florida corporation (the "General Partner"), AMTAX HOLDINGS 690, LLC, an Ohio limited liability company (the "Investor Limited Partner"), PROTECH 2005-C, LLC, an Ohio limited liability company (the "Special Limited Partner"), as Limited Partners, and DILIP BAROT (the "Withdrawing Limited Partner").

A.      The General Partner executed a Certificate of Limited Partnership for the formation of Creative Choice Homes XXX, Ltd. (the "Partnership") pursuant to the terms of the Florida Revised Uniform Limited Partnership Act, as amended (the "Act"), which was subsequently filed with the Secretary of State of Florida (the "State") on September 19, 2002 (the "Certificate").

B.      On September 19, 2002, the General Partner and the Withdrawing Limited Partner executed an Agreement of Limited Partnership (the "Original Agreement") of the Partnership.

C.      The General Partner, Special Limited Partner and the Investor Limited Partner wish to continue the Partnership pursuant to the Act.

D.      The Partnership has been formed to develop, construct, own, maintain and operate a 132-unit multifamily project intended for rental to persons of low and moderate income, to be known as Fountainview Apartments, and to be located in Tampa, Florida (the "Project").

E.      The parties hereto now desire to enter into this Amended and Restated Agreement of Limited Partnership to (i) continue the Partnership under the Act; (ii) admit the Investor Limited Partner and the Special Limited Partner to the Partnership as Limited Partners; (iii) withdraw the Withdrawing Limited Partner from the Partnership; (iv) amend and restate the Original Agreement in its entirety; and (v) set forth all of the provisions governing the Partnership.

NOW, THEREFORE, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to continue the Partnership pursuant to the Act, as set forth in this Agreement, which reads in its entirety as follows:

# 3146610_v6

*Fountainview Apt.(XXX)*

## ARTICLE I

## CONTINUATION OF PARTNERSHIP

1.1.    <u>Continuation/Admission</u>.  The undersigned hereby continue the Partnership as a limited partnership under the Act.  The Investor Limited Partner and Special Limited Partner are hereby admitted to the Partnership.

1.2.    <u>Name</u>.  The name of the Partnership is Creative Choice Homes XXX, Ltd., a Florida limited partnership; provided however, that, with the Consent of the Investor Limited Partner, the General Partner may change the name of the Partnership at any time and from time to time, except that in no event shall the name of the Partnership include the name or initials of the Investor Limited Partner and the Special Limited Partner, or any name or initials which are substantially similar thereto.

1.3.    <u>Principal Executive Offices; Agent for Service of Process</u>.  The principal executive office of the Partnership is  4243 Northlake Boulevard, Suite D, Palm Beach Gardens, Florida, 33410.  The Partnership may change the location of its principal executive office to such other place or places as may hereafter be determined by the General Partner.  The General Partner shall promptly notify all other Partners of any change in the principal executive office. The Partnership may maintain such other offices at such other place or places as the General Partner may from time to time deem advisable.  The name and address of the agent for service of process are Dilip Barot, President, c/o Creative Choice Homes XXX, Ltd., 4243 Northlake Boulevard, Suite D, Palm Beach, Florida, 33410.

1.4.    <u>Withdrawal of Withdrawing Limited Partner</u>.  The Withdrawing Limited Partner hereby withdraws as a Partner of the Partnership. The Withdrawing Limited Partner is a party to this Agreement for the sole purpose of withdrawing as a limited partner of the Partnership and for no other purpose.  The effective date of the Withdrawing Limited Partner's withdrawal from the Partnership shall be the date on which this Agreement is fully executed by all parties.  The General Partner and the Limited Partners hereby release the Withdrawing Limited Partner from all obligations to the Partnership.  The Withdrawing Limited Partner acknowledges (i) receipt of the return of its capital contribution to the Partnership, (ii) that, as Withdrawing Limited Partner, it has no interest in the Partnership or any property or assets of the Partnership, and (iii) that, as Withdrawing Limited Partner, it is not entitled to any fees, distributions, compensation or payments from the Partnership or any of the Partners.

1.5.    <u>Term</u>.  The term of the Partnership commenced on September 19, 2002, the date of filing of the Certificate with the Secretary of State of the State, and shall continue until December 31, 2065, unless the Partnership is sooner dissolved in accordance with the provisions of this Agreement.

1.6.    <u>Filing of Certificate</u>.  Upon the execution of this Agreement by the parties hereto, the General Partner shall take all actions necessary to assure the prompt filing of an amendment to the Certificate if and as required by the Act, including filing with the Secretary of State of the State.  All fees for filing shall be paid out of the Partnership's assets.  The General Partner shall take all other necessary action required by law to perfect and maintain the Partnership as a

#3146610_v6                                     - 2 -

limited partnership under the laws of the State, and shall register the Partnership under any assumed or fictitious name statute or similar law in force and effect in the State.

## ARTICLE II

## DEFINED TERMS

In addition to the terms defined in the preamble to this Agreement, the following terms used in this Agreement shall have the meanings specified below:

"Accountants" means Habif Arogeti and Wynne or such other firm of independent certified public accountants (which is materially recognized for its work in the field of Tax Credits) as may be engaged by the General Partner, with the Consent of the Special Limited Partner, to prepare the Partnership income tax returns.

"Act" means the Florida Revised Uniform Limited Partnership Act, as may be amended from time to time.

"Actual Credits" means with respect to any period of time, the total amount of the Tax Credits allocated by the Partnership to the Investor Limited Partner, representing ninety-nine and ninety-nine hundredths percent (99.99%) of the Tax Credits reported and claimed by the Partnership and its Partners on their respective federal information and income tax returns, and not disallowed by any taxing authority.

"Adjusted Capital Account" means, with respect to any Partner, such Partner's Capital Account as of the end of the relevant taxable year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations.

"Admission Date" means the date upon which the Special Limited Partner and Investor Limited Partner are admitted to the Partnership as Limited Partners.

"Adverse Consequences" means (i) all actual damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses actually paid to third parties by the party suffering the Adverse Consequences in connection with any and all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, and rulings and (ii) the costs of any fees or other compensation reasonably necessary to a third party in connection with replacement of a General Partner.

"Affiliate" means any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the General Partner, the Investor Limited Partner, the Special Limited Partner or with another designated Person, as the context may require and provided that with respect to the Management Agent such "controls" as used in this definition shall mean "controls day to day affairs" of the Management Agent.

# 3146610_v6

- 3 -

"AFR" means the long-term applicable Federal rate (as defined in Section 1274(d) of the Code).

"Agency" means the Florida Housing Finance Corporation in its capacity as the designated agency of the State to allocate Tax Credits, acting through any authorized representative.

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Application" means the Partnership's Tax Credit Application submitted to and approved by the Agency for any undertaking with respect to the development and operation of the Project, and pursuant to which the Partnership received a Tax Credit Reservation.

"Asset Management Fee" means the fee payable to Paramount, or an Affiliate of Paramount as its designee, pursuant to Section 13.4(k).

"Authority" or "Authorities" means any nation or government, any state or other political subdivision thereof, and any entity exercising its executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including but not limited to, any federal, state or municipal department, commission, board, bureau, agency, court, tribunal or instrumentality.

"Bankruptcy" or "Bankrupt" as to any Person means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code of 1978 or like provision of law (except if such petition is contested by such Person and has been dismissed within ninety (90) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of its assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates its approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within ninety (90) days.

"Basis Certification" means the cost certification, prepared or audited by the Accountants at the time of the application for Form(s) 8609, of the Partnership's development and related costs for the purposes of establishing Eligible Basis.

"Breakeven Operations" means the date upon which the income from the normal operation of the Project (other than any governmental subsidies which shall be deemed received on the accrual basis) received on a cash basis for a period of three (3) consecutive calendar months (or four (4) months in the aggregate) after Substantial Completion, equals or exceeds all accrued operational costs of the Project, including but not limited to taxes, assessments, Reserve For Replacement deposits, and debt service payments on the Permanent Loan (assuming debt service costs necessary to fully amortize principal on the Permanent Loan at the underwriting rate, and if the Permanent Loan is not yet in existence, the amount and terms of the Permanent

#3146610_v6                                                    - 4 -

Loan as defined herein shall be assumed and an underwriting rate of 6.43% shall also be assumed for principal amortization purposes), but excluding all fees or other payments which by their nature are payable only out of Net Cash Flow, the Asset Management Fee and payments from reserves or insurance proceeds or capital expenditures, and further including a ratable portion of the annual amount (as reasonably estimated by the General Partner) of those seasonal and/or periodic expenses (such as utilities, maintenance expenses and real estate taxes or service charges in lieu of real estate taxes) which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation, for such period of three (3) consecutive calendar months (or four (4) months in the aggregate) on an annualized basis (based on projections of the Partnership), as evidenced by a certification of the General Partner. If free rent or other rental concessions shall have been granted to tenants, the calculation of income pursuant to the preceding sentence shall be adjusted so that the effect of such concessions is amortized over the term of the affected leases against accrued operational costs on an annualized basis as reasonably approved by the Special Limited Partner. The determination that Breakeven Operations has occurred shall be evidenced by an Accountants' report or certification and subject to confirmation by the Special Limited Partner pursuant to a physical inspection of the Project. If the Special Limited Partner determines that Breakeven has not occurred, it shall, within five (5) business days following the completion of such inspection, notify the General Partner of such deficiencies in writing, and the General Partner shall have five (5) business days or such other reasonable period of time from the receipt of such notice to cure the deficiencies set forth in the Limited Partner notice; provided, however, that in the event that the Special Limited Partner does not make such physical inspection of the Project within ten (10) business days after having received the Accountants' report, then the Special Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven Operations shall be deemed to have occurred.

"Bridge Loan" means the bridge loan in the maximum principal amount of $2,000,000 to be made to the Partnership by the Construction Lender, which is evidenced and secured by the Bridge Loan Documents.

"Bridge Loan Documents" means the Bridge Loan Note, the Bridge Loan Agreement, the Bridge Loan Mortgage and other related documents executed by the Partnership in connection with the Bridge Loan, the forms of which are subject to the consent of the Special Limited Partner.

"Bridge Loan Mortgage" means the mortgage or deed of trust given by the Partnership at Initial Closing in favor of the Construction Lender as maker of the Bridge Loan securing the Bridge Loan.

"Bridge Loan Note" means the promissory note give by the Partnership to the Construction Lender at Initial Closing.

"Capital Account" means the capital account of a Partner as described in Section 11.5.

"Capital Contribution" means the total amount of money or other property contributed or agreed to be contributed, as the context requires, to the Partnership by each Partner pursuant to

the terms of this Agreement. Any reference to the Capital Contribution of a Partner shall include the Capital Contribution made by a predecessor holder of the Interest of such Partner.

"Capital Installment" means any installment of the Capital Contribution of the Investor Limited Partner paid or payable to the Partnership pursuant to Section 5.1(c).

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Net Cash Flow, including without limitation a sale, refinance, exchange, transfer, assignment or other disposition (including a condemnation or foreclosure) of all or substantially all of the Project, and a casualty (to the extent proceeds are not used to rebuild the Project) affecting the Project.

"Carryover Certification" means the Accountants' certification of carryover expenditures as required by the Agency, including the back-up supporting the Accountant's certification, and the Agency's written confirmation of its receipt.

"Cash Available for Debt Service Expense" means, for any specified period of consecutive months beginning not earlier than the Completion Date, the excess of (i) all Cash Receipts during such period over (ii) all normal operating cash requirements of the Partnership properly allocable to such period of time on an accrual basis (not including distributions or payments to Partners or Affiliates out of Cash Flow of the Partnership, Partnership Management Fees, or the Incentive Management Fees, Asset Management Fees, capital expenditures, expenditures funded from reserves or insurance proceeds or discretionary reserves created by the General Partner) and, on an annualized basis (pro rated for the applicable period), all projected normal operating expenditures, including those of a seasonal nature which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation (amortized equally over a calendar year), as determined by the Accountants but specifically excluding Debt Service Expense and debt service payable solely to the extent of available cash flow (i.e., the Subordinate Loan). For purposes of this definition, cash requirements of the Partnership shall include to the extent not otherwise covered above, full funding of reserves (to the extent required in the Project Documents) and normal repairs.

"Cash Receipts" means with respect to a Fiscal Year or other applicable period, all rental revenue, laundry income, parking revenue, and other incidental revenues which are received by the Partnership on a cash basis during such period and arise from normal operations of the Project plus rental subsidies on an accrual basis, but specifically excluding interest on Partnership reserves (unless otherwise available to pay debt service or operating expenses), proceeds from insurance (other than business or rental interruption insurance), loans, proceeds of a Capital Transaction or Capital Contributions. In addition, any amount released to the Partnership without restriction from any escrow account in a Fiscal Year shall be considered a cash receipt of the Partnership for such Fiscal Year.

"Certificate" means the Partnership's Certificate of Limited Partnership or any certificate of limited partnership or any other instrument or document which is required under the laws of the State to be signed and sworn to by the Partners of the Partnership and filed in the appropriate public offices within the State to perfect or maintain the Partnership as a limited partnership under the laws of the State, to effect the admission, withdrawal or substitution of any Partner of

#3146610_v6

- 6 -

the Partnership, or to protect the limited liability of the Investor Limited Partner as a limited partner under the laws of the State.

"Certified Credits" means ninety-nine and ninety-nine hundredths percent (99.99%) of the annual Tax Credits, that the Partnership will be able to claim during each full fiscal year during the Credit Period (provided that for any partial year during the Credit Period, Certified Credits shall be adjusted to reflect such fact) for all buildings in the Project assuming full compliance with the rent restrictions and income limitations of Section 42 of the Code. The calculation of the Certified Credits shall be based on the Forms 8609s issued by the Agency for all the buildings comprising the Project and the Basis Certification prepared in connection with the application by the Partnership for Forms 8609s, as such amount may be increased or decreased as a result of any credit reduction for which a Capital Installment is increased or decreased or a payment is made or is to be made under any of the adjuster provisions herein.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of succeeding law.

"Compliance Period" means the compliance period (as defined in Section 42(i)(1) of the Code) applicable to the Project.

"Consent" means the prior written consent or approval of the Special Limited Partner, the Investor Limited Partner and/or any other Partner, as the context may require, to do the act or thing for which the consent is solicited. If there is more than one Investor Limited Partner, then Consent of the Investor Limited Partner shall require only the prior written approval of the Investor Limited Partners owning a majority of the Percentage Interests of all the Investor Limited Partners.

"Contractor" means Summit Contractors Group, Inc., which is the general construction contractor of the Project.

"Construction Contract" means the construction contract dated as of December 5, 2005, in the amount of $9,700,000 including all exhibits and attachments thereto, entered into between the Partnership and the Contractor, pursuant to which the Project is to be constructed and which is subject to the Consent of the Investor Limited Partner.

"Construction Lender" means Bank of America, N.A., in its capacity as the maker of the Construction Loan, or its successor and assigns in such capacity.

"Construction Loan" means the construction loan in the principal amount of $4,000,000 to be made to the Partnership by the Construction Lender at Initial Closing, which is evidenced and secured by the Construction Loan Documents

"Construction Loan Agreement" means the agreement with respect to the terms and conditions of the Construction Loan entered into between the Construction Lender and the Partnership at Initial Closing.

"Construction Loan Documents" means the Construction Loan Note, the Construction Loan Agreement, the Construction Mortgage and other related security documents, financing

statements and other documents executed by the Partnership in connection with the Construction Loan, the forms of which are subject to the Consent of the Special Limited Partner.

"Construction Loan Mortgage" means the mortgage or deed of trust given by the Partnership at Initial Closing in favor of the Construction Lender as maker of the Construction Loan securing the Construction Loan.

"Construction Loan Note" means the promissory note given by the Partnership to the Construction Lender at Initial Closing.

"Consumer Price Index" or "C.P.I." means the Consumer Price Index for All Urban Consumers, U.S. City Average, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. If such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefore.

"Counsel" means Broad and Cassel, of Orlando, Florida, or such other attorney or law firm upon which the Partners shall unanimously agree; provided, however, that if any section of this Agreement either (i) designates particular counsel for the purpose described therein, or (ii) provides that counsel for the purpose described therein shall be chosen by another method or by another Person, then such designation or provision shall prevail over this general definition.

"Credit Period" means the period of ten (10) years beginning with the taxable year in which the Project is placed in service or, if an election has been made pursuant to Section 42(f)(1) of the Code to defer the commencement of the Credit Period, with the Consent of the Investor Limited Partner, the succeeding taxable year, as more specifically defined in Section 42(f) of the Code.

"Credit Recovery Loan" means the loan deemed to be made to the Partnership by the Investor Limited Partner, as more particularly described in Section 8.8(c)(iii).

"Debt Service Coverage Ratio" means, for any period, a fraction, the numerator of which is the Cash Available for Debt Service Expense with respect to such period and the denominator of which is the Debt Service Expense for such period. The achievement by the Partnership of a specified Debt Service Coverage Ratio shall be confirmed by the Accountants and shall be subject to independent confirmation by the Special Limited Partner pursuant to a physical inspection of the Property for the purpose of confirming that the Property is in good condition and repair (ordinary wear and tear excepted); provided, however, that (i) no objection by the Special Limited Partner to the determination of the Accountants based on its physical inspection of the Property shall be valid unless the General Partner is notified of such objection, and the specific reasons therefor, within five (5) business days following the completion of such inspection and (ii) the General Partner shall have five (5) business days or other reasonable period of time from receipt of the Investor Limited Partner's notice to cure the deficiencies set forth in the Investor Limited Partner's notice. If the Special Limited Partner does not make such physical inspection of the Property within ten (10) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

*Fountainview Apt.(XXX)*

"Debt Service Expense" means, for any period, all debt service, reserve, and mortgage insurance premium imposed by the Permanent Loan Documents (including without limitation recurring fees payable by the Partnership to the Lender) or any other indebtedness properly allocable to such period of time on an annualized accrual basis as determined by the Accountants (assuming debt service costs necessary to fully amortize principal on the Permanent Loan at the underwriting rate, and if the Permanent Loan is not yet in existence, the amount and terms of the Permanent Loan as defined herein shall be assumed and an underwriting rate of 6.43% shall also be assumed for principal amortization purposes).

"Default IP Loans" means IP Loans (or portions thereof) that arise from a default by the General Partner in its obligations to the Partnership under this Agreement.  For example, an IP Loan made to fund Operating Deficits that the General Partner failed to fund in breach of its Operating Deficit Guaranty shall constitute a Default IP Loan.

"Deferred Development Fee" means the portion of the Development Fee payable by the Partnership to the Developer out of remaining Permitted Sources, Net Cash Flow or the proceeds of a Capital Transaction pursuant to the Development Agreement.

"Deficit Restoration Obligation" means, for each Partner, the sum of (a) any amounts that such Partner is or is deemed to be obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h), or any other applicable provisions of the Regulations, (b) such Partner's share of Partnership Minimum Gain, if any, and (c) such Partner's share of Partner Nonrecourse Debt Minimum Gain, if any.

"Developer" means Creative Choice Homes, Inc., a Florida corporation.

"Development Agreement" means the development agreement between the Partnership and the Developer as of even date herewith relating to the development of the Project and providing for the payment of the Development Fee.

"Development Budget" means the construction, development and financing budget approved by the Special Limited Partner for the construction, development and financing of the Project, including without limitation the construction of the Project, the furnishing of all personalty in connection therewith, and the operation of the Project prior to Substantial Completion, as amended.

"Development Costs" means all direct or indirect costs paid or payable by the Partnership related to the acquisition of the Land and the development and construction of the Project prior to Substantial Completion, and all costs of completing punchlist items regardless of when incurred, and all direct or indirect costs paid or payable by the Partnership related to the operation of the Project prior to Final Closing, including without limitation the following: (i) costs of acquiring, financing, developing and constructing the Project, as described in and as contemplated by the Plans and Specifications and the Project Documents, including without limitation, any construction cost overruns, the cost of any change orders, the cost of any change orders necessary to ensure compliance with all applicable local building and zoning codes and all costs necessary to achieve Final Closing; (ii) all debt service expense which is due and payable at any time prior to Final Closing; (iii) all costs, payments and deposits needed to avoid a default

# 3146610_v6

- 9 -

under the PFG Bridge Loan or the Project Loans (prior to Final Closing), including without limitation, all costs, payments, expenses and other amounts which are required pursuant to the Loan Agreement, and all required deposits to satisfy any requirements of the Lender and the Investor Limited Partner to keep the proceeds of the Construction Loan "in balance"; (iv) all monthly payments required to be made to the Reserve For Replacements prior to Final Closing; (v) all costs and expenses payable prior to Final Closing relating to remedying any environmental problem or condition of hazardous materials prior to Final Closing or was known to exist prior to Final Closing; (vi) all costs, expenses and other charges payable in connection with the operation of the Project prior to Final Closing, including without limitation local taxes, utilities, mortgage insurance premiums and casualty and liability insurance premiums and any other amounts required pursuant to the Loan Agreement; (vii) all other costs and expenses of the Partnership payable prior to Final Closing, including without limitation, legal fees, architectural and engineering expenses and fees of other professionals, the costs of personal property and fixtures for the entire Project and the reimbursement by the Partnership of the legal and other fees and costs of the General Partner and the Investor Limited Partner to the extent required to be paid by the Partnership as set forth in this Agreement; (viii) any fees paid or due the General Partner and its Affiliates, including any portion of the Development Fee required to be paid by the Partnership prior to Final Closing pursuant to the Project Documents (but excluding the Deferred Development Fee); (ix) all costs to achieve Initial Closing; (x) all Operating Deficits incurred by the Partnership prior to Final Closing; and (xi) all costs and expenses associated with paying off the PFG Bridge Loan (if applicable). Development Costs shall not include costs paid by insurance proceeds or reserves.

"Development Fee" means the fee payable by the Partnership to the Developer pursuant to Section 3 of the Development Agreement.

"DRO Notice" shall have the meaning set forth in Section 11.5 (d).

"DRO Notice Partner" shall have the meaning set forth in Section 11.5 (d).

"Economic Risk of Loss" has the meaning set forth in Treasury Regulation Section 1.752-2.

"Eligible Basis" means the adjusted basis of all of the buildings in the Project, determined as to each such building as of the close of the first year of its credit period, and as more particularly defined in Code Section 42(d) and the Regulations and rulings thereunder.

"Environmental Reports" means those certain reports entitled Geotechnical Engineering Services Report, dated December 15, 2004 that was prepared by Professional Service Industries, Inc.; Phase I Environmental Site Assessment, dated January 8, 2004 that was prepared by Professional Service Industries, Inc. and; Phase I Environmental Site Assessment, dated September 23, 2005 that was prepared by Land America.

"Excess Development Costs" means as of any particular date all of the Development Costs which are in excess of the Permitted Sources as of such date.

"Extended Use Agreement" means the extended low-income housing commitment executed or to be executed by the Partnership and the Agency and properly recorded in the

#3146610_v6                                     - 10 -

appropriate land records for the jurisdiction in which the Project is located, setting forth certain terms and conditions under which the Project is to be operated and which meets the requirements of Code Section 42(h)(6)(B).

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Fifty Percent Construction Completion" means the date as of which the Inspecting Architect certifies that the work to be performed by the Contractor under the Construction Contract is, in the aggregate and not on a building by building basis, 50% complete and that at least 50% of hard construction costs have been incurred.

"Final Closing" means the occurrence of all of the following: (i) Substantial Completion; (ii) Breakeven Operations; (iii) the Basis Certification; (iv) disbursement by the Lender of the Permanent Loan proceeds; (v) repayment of the Construction Loan, the Bridge Loan and the PFG Bridge Loan, if applicable; and (vi) commencement of amortization as to the Permanent Loan (to the extent the Permanent Loan requires principal amortization); provided, however, that Final Closing shall not be deemed to have occurred if on such date any liens or other encumbrances as to title to the Land and the Project exist, other than the Permitted Exceptions.

"Final Determination" means the earliest to occur of (a) the date on which a decision, judgment, decree or other order has been issued by any court of competent jurisdiction with respect to an action to which the Partnership is a party, which decision, judgment, decree or other order has become final (i.e., all allowable appeals requested by the parties to the action have been exhausted), (b) the date on which the Service has entered into a binding agreement with the Partnership with respect to such issue or on which the Service has reached a final administrative determination with respect to such issue which, whether by law or agreement, is not subject to appeal, (c) the date on which the time for instituting a claim by the Partnership for refund has expired, or if a claim was filed the time for instituting suit with respect thereto has expired, (d) the date on which the applicable statute of limitations for raising an issue by the Partnership regarding a federal income tax matter with respect to the Partnership has expired, or (e) the filing with the appropriate federal or state authority of an amended Federal or State tax or informational return by the Partnership, upon the advice of the Accountants and Consent of the Partners.

"Force Majeure" means natural disasters, including earthquakes, hurricanes and floods, wars, riots, acts of terrorism or other major upheaval.

"Forms 8609" means the IRS Form 8609 issued by the Agency for each residential building of the Project which finally allocates Tax Credits to such residential building.

"40-60 Set-Aside Test" means the Minimum Set-Aside Test whereby at least 40% of the units in the Project must be occupied by individuals with incomes of 60% or less of area median income, as adjusted for family size.

*Fountainview Apt.(XXX)*

"General Partner" means Creative Choice Homes XXX, Inc., a Florida corporation, and any other Person admitted as a general partner pursuant to this Agreement, and their respective successors pursuant to this Agreement.

"General Partner's Special Capital Contribution" has the meaning set forth in Section 5.1(a).

"GP Casualty Loan" means a GP Loan made pursuant to the provisions of Section 5.6(a).

"GP Distribution" has the meaning set forth in Section 11.1(a).

"GP Loans" means the loans which may be made by the General Partner to the Partnership pursuant to Section 5.6 hereof, including any accrued interest thereon. Operating Deficit Loans shall not constitute GP Loans.

"Gross Revenues" means total income, revenue (including gross rental income of the Project prior to any reduction or payments for fees, costs and reimbursements to Management Agent), profit, and gain, proceeds from a sale or refinancing of the Project (all as adjusted by refunds and amounts held in escrow, but not by amounts held or placed in reserves) from all sources, including interest, royalties and dividends, whether taxable, nontaxable or exempt from taxation.

"Guarantor" means Creative Choice Homes, Inc., a Florida corporation.

"Guaranty" means the guaranty of the performance of certain of the obligations of the General Partner under this Agreement for the benefit of the Investor Limited Partner and Special Limited Partner given by the Guarantor.

"Hazardous Substance(s)" means oil, petroleum or chemical liquids or solids, liquid or gaseous products or any hazardous wastes or hazardous substances, as those terms are used in the Hazardous Waste Laws.

"Hazardous Waste Laws" means the Clean Air Act, Clean Water Act, Resource Conservation and Recovery Act, Toxic Substance Control Act, Safe Drinking Water Control Act, Occupational Safety and Health Act, Hazardous Material Transportation Control Act of 1970, Insecticide, Fungicide, and Rodenticide Act, Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Lead-Based Paint Poisoning Prevention Act and related regulations, and any other federal, state or local law governing Hazardous Substances, as such laws may be amended from time to time.

"Incentive Management Agreement" means the Incentive Management Fee Agreement between the Partnership and the General Partner of even date herewith pursuant to which the General Partner is to provide certain supplemental services with respect to the Project.

"Incentive Management Fee" means the fee payable by the Partnership to the General Partner pursuant to Section 8.11(a) of this Agreement and the Incentive Management Agreement.

#3146610_v6

- 12 -

"Initial Closing" means the date upon which the Construction Loan is closed.  The Initial Closing is anticipated to occur on or about December 21, 2005.

"Initial Occupancy Achievement" means the first date on which the Project has achieved both Qualified Economic Occupancy and Qualified Physical Occupancy of 90%.

"Initial Period" shall have the meaning set forth in Section 8.8(b) of this Agreement.

"Inspecting Architect" means Forum Architecture and Interior Design, Inc., or any successor to such firm.

"Interest" or "Partnership Interest" means the ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which such Partner may be entitled as provided in this Agreement and in the Act, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and of said Act.  Such Interest of each Partner shall, except as otherwise specifically provided herein, be that percentage of the aggregate of such benefit or obligation specified by Section 5.1 as such Partner's Percentage Interest.

"Invested Amount" means an amount equal to the sum of (i) the aggregate funded Capital Installments of the Investor Limited Partner advanced pursuant to Section 5.1 hereof; (ii) all penalties and interest imposed by the Code and assessed against the Investor Limited Partner by the IRS with respect to any recapture of tax credits allocated to the Investor Limited Partner and reduced by (a) any distributions of Net Cash Flow and/or proceeds from a Capital Transaction and/or other distributions and returns of capital (including any payments made to the Investor Limited Partner under Section 5.1(d)(i); and (b) $1.00 for each Tax Credit retained and not subject to recapture.

"Investment Assumptions" means those certain investment assumptions prepared by Paramount and attached as Exhibit F hereto.

"Investor Limited Partner" means AMTAX Holdings 690, LLC, an Ohio limited liability company.

"Involuntary Withdrawal" means, as to a General Partner, and shall be deemed to have occurred automatically upon, the occurrence of death, adjudication of insanity or incompetence, Bankruptcy, dissolution (unless such General Partner is reinstated within ten (10) days after receipt of notice of such dissolution) or involuntary withdrawal from the Partnership for any reason.  Involuntary Withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law, death, incapacity or pursuant to any terms of this Agreement.  A General Partner which is a limited liability entity, corporation or partnership also will be deemed to have Involuntarily Withdrawn upon the sale or other disposition (except by reason of death or estate planning purposes) of a controlling interest in a limited liability or corporate General Partner or of a general partner interest in a General Partner that is a partnership.  Without limitation of the foregoing, any event occurring as to an individual, corporate or limited liability general partner of a General Partner that is a partnership or of a managing member or partner of a General Partner that is a limited liability company or partnership that would constitute an Involuntary Withdrawal as to an individual or corporate General Partner as provided above

# 3146610_v6                                             - 13 -

(except by reason of death), shall also be deemed to constitute an Involuntary Withdrawal of any such General Partner that is a partnership or limited liability entity.  For purposes of this definition, "controlling interest" shall mean the power to direct the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"IP Loans" means the loans which may be made by the Investor Limited Partner or its designee to the Partnership pursuant to Section 5.6 hereof, including accrued interest thereon.

"IRS" means the Internal Revenue Service.

"Keepwell Agreement" means that certain Keepwell Agreement dated as of the date hereof by and between the Guarantor, the Limited Partners and Dilip Barot.

"Land" means the tract of land currently owned by the Partnership upon which the Project will be located.

"Lender" means the Construction Lender and/or the maker of the Permanent Loan, the Subordinate Lender and/or the maker of the PFG Bridge Loan, their successor(s) and assigns in such capacity, as the context requires.

"Limited Partner" means the Investor Limited Partner, the Special Limited Partner or any other Limited Partner in such Person's capacity as a limited partner of the Partnership.

"Limited Recourse Liability" has the meaning given it in Section 8.8(c)(v).

"Liquidator" means the General Partner or, if there is none at the time in question, such other Person who may be appointed in accordance with applicable law and who shall be responsible for taking all action necessary or appropriate to wind up the affairs of, and distribute the assets of, the Partnership upon its dissolution.

"Loan Agreement" means the Construction Loan Agreement, the PFG Bridge Loan Agreement (if applicable), the Subordinate Loan Agreement and the agreement to be entered into between the Partnership and the Permanent Lender with respect to the terms and conditions of making the Permanent Loan.

"Management Agent" means Lincoln Apartment Management Limited Partnership, a Delaware limited partnership, or any successor thereto engaged by the General Partner as the management agent for the Project, with the Consent of the Special Limited Partner.

"Management Agreement" means the agreement between the Partnership and the Management Agent, providing for the marketing and property management of the Project by the Management Agent, and subject to the Consent of the Special Limited Partner as to both form and substance.

"Management Fee" means the fee described in Section 8.16(b).

"Minimum Set-Aside Test" means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code with respect to the percentage of units in its Project to be occupied by tenants with incomes equal to no more than a certain percentage of area median income. The Partnership has selected or will select the 40-60 Set-Aside as the Minimum Set-Aside Test.

"Mortgage" means the Bridge Loan Mortgage, Construction Loan Mortgage, the Subordinate Loan Mortgage and the Permanent Mortgage.

"Net Cash Flow" means the following: (a) all cash received from rents, lease payments and all other sources, but excluding (i) tenant security or other deposits until forfeited, (ii) Capital Contributions and interest thereon (other than if used to pay for an item deducted below in determining Net Cash Flow), (iii) proceeds of the PFG Bridge Loan, if any, (iv) proceeds from Capital Transactions, (v) interest on reserves not available for distribution, and (vi) proceeds from Operating Deficit Loans, IP Loans, and GP Loans; plus (b) the net proceeds of any insurance, other than fire and extended coverage and title insurance to the extent not reinvested; plus (c) any other funds deemed available for distribution by the General Partner with the approval of the Project Lenders, if required, minus the sum of the following items: (1) all cash expenditures (other than those payable from Net Cash Flow and the Asset Management Fee), and all cash expenses unpaid but due and payable (whether or not such expenditure is deducted, amortized or capitalized for tax purposes), including the management fee to the Management Agent; (2) all payments on account of any loans made to the Partnership (whether such loan is made by a Partner or otherwise), but not including any amounts to be paid as Deferred Development Fee, Credit Recovery Loans, IP Loans, GP Loans and Operating Deficit Loans or other debt payable from Net Cash Flow and identified as Exhibit G; and (3) any cash reserves for working capital, capital expenditures, repairs, replacements and anticipated expenditures, in such amounts as may be required by the Project Lenders, or may be determined from time to time by the General Partner to be advisable for the operation of the Partnership.

Net Cash Flow shall be determined separately for each fiscal year or portion thereof commencing on the day after Final Closing and shall not be cumulative. For the period of time from and after the Final Closing, Net Cash Flow shall be distributed as permitted and pursuant to the Project Documents or rules or regulations of the Agency.

"Net Interim Income" means Net Cash Flow received by the Partnership prior to Final Closing.

"Notice" means a writing containing the information required by this Agreement to be communicated to a Partner and sent by express courier or telephone facsimile transmission, or by registered or certified mail, with postage prepaid and return receipt requested, to such Partner at such Partner's address as specified pursuant to Section 16.7, the date of receipt thereof (or the next business day if the date of receipt is not a business day) (or, in the case of registered or certified mail, the date of registry thereof or the date of the certification receipt, as applicable) being deemed the date of such Notice; provided, however, that any written communication containing such information sent to such Partner actually received by such Partner shall constitute Notice for all purposes of this Agreement.

# 3146610_v6

- 15 -

"Operating Deficit" means the amount by which the income of the Partnership from rental payments made by tenants of the Project, and all other income of the Partnership (other than proceeds of any loans to the Partnership and investment earnings on funds on deposit in the Reserve For Replacements, and other such reserve or escrow funds or accounts other than funds from such reserves that are available for distribution) for a particular period of time, is exceeded by the sum of all operating expenses, including all debt service (other than soft debt payable to the extent of available cash flow), operating and maintenance expenses, required deposits into the Reserve For Replacements, any fees to the Project Lenders and/or any applicable mortgage insurance premium payments and all other Partnership obligations or expenditures, and excluding Development Costs and any fees or other obligations payable only to the extent of available Net Cash Flow and further excluding obligations properly paid from reserves or insurance proceeds.

"Operating Deficit Loan" has the meaning set forth in Section 8.8 of this Agreement.

"Paramount" means Paramount Financial Group, Inc., an Ohio corporation (formerly known as Paramount, Inc.), an Affiliate of the Investor Limited Partner and the Special Limited Partner.

"Paramount Entities" means PFG Holdings Corp., a Colorado corporation, and its Affiliates, including, but not limited to, Paramount and the Special Limited Partner.

"Partner" means any General Partner and any Limited Partner.

"Partner Loans" means, collectively, any IP Loans and GP Loans made pursuant to Section 5.6 of this Agreement.

"Partner Nonrecourse Debt Minimum Gain" means the amount of partner nonrecourse debt minimum gain and the net increase or decrease in partner nonrecourse debt minimum gain determined in a manner consistent with Treasury Regulation Sections 1.704-2(d), 1.704-2(i)(2) and (i)(3) and 1.704-2(k).

"Partnership" means Creative Choice Homes XXX, Ltd., a Florida limited partnership.

"Partnership Management Fee" means the annual fee payable to the General Partner pursuant to Section 8.11(b).

"Partnership Minimum Gain" means the amount determined by computing, with respect to each Partnership Nonrecourse Liability, the amount of gain, if any, that would be realized by the Partnership if it disposed of the property (in a taxable transaction) subject to such liability in full satisfaction of such liability, and by then aggregating the amounts so computed. Such computations shall be made in a manner consistent with Treasury Regulation Sections 1.704-2(d) and 1.704-2(k).

"Partnership Nonrecourse Liability" means any Partnership liability (or portion thereof) for which no Partner or Related Person bears the Economic Risk of Loss.

"Payment Date" means the date which is ninety (90) days after the end of the Partnership's fiscal year with respect to the preceding fiscal year.

"Percentage Interest" means the percentage Interest of each Partner as set forth in Section 5.1 of this Agreement and Exhibit A attached hereto.

"Permanent Commitment" means that certain Forward Commitment for Fixed Rate Mortgage Loan Not to Exceed $4,000,000 under the Freddie Mac Forward Commitment Product Line Relating to the Project dated as of December 21, 2005 between the Partnership and the Permanent Lender.

"Permanent Lender" means GMACCM Commercial Mortgage Corporation, a California corporation, acting through its Affordable Housing Division, in its capacity as the maker of the Permanent Loan, or its successor and assigns in such capacity.

"Permanent Loan" means the nonrecourse mortgage loan which will constitute the permanent mortgage financing for the Project from the Lender in the anticipated principal amount of $4,000,000 to be made to the Partnership by the Lender at Final Closing, and which is to be secured by the Permanent Mortgage and other related security documents and financing statements.

"Permanent Loan Documents" means the documents evidencing and securing the Permanent Loan.

"Permanent Mortgage" means the mortgage or deed of trust to be given by the Partnership in favor of the Permanent Lender as maker of the Permanent Loan securing the Permanent Loan.

"Permitted Exceptions" means those easements, covenants, restrictions, and other exceptions that are included in the Title Policy and the Project Loans, ordinary or necessary utility and access easements, any lien bonded off or affirmatively insured against such that it will not cause a lien against the Project, the Mortgage, the Extended Use Agreement and any Regulatory Agreement.

"Permitted Sources" means (i) proceeds of all Project Loans; (ii) interest, if any, earned on the proceeds of the Project Loans pending the expenditure of such proceeds to pay Development Costs; (iii) the Deferred Development Fee; (iv) the Capital Contributions required by the Partners under this Agreement (other than the General Partner's Special Capital Contribution); (v) Net Interim Income (to the extent permitted and pursuant to the Project Documents or the Agency); and (vi) any insurance proceeds arising out of casualties prior to Final Closing in excess of repairs or capital improvements.

"Person" means any individual, partnership, corporation, trust, limited liability company or other entity.

"PFG Bridge Loan" means the recourse loan that may be made or caused to be made to the Partnership by Paramount as provided in Section 5.1(c)(x) of this Agreement.

*Fountainview Apt.(XXX)*

"PFG Bridge Loan Agreement" means the agreement with respect to the terms and conditions of the PFG Bridge Loan which may be entered into between Paramount or its Affiliates.

"PFG Bridge Loan Commitment" means that certain commitment letter dated as of December 20, 2005 from Paramount with regard to the PFG Bridge Loan.

"PFG Bridge Loan Documents" means the PFG Bridge Loan Commitment, PFG Bridge Loan Note, the PFG Bridge Loan Agreement and all other documents evidencing and securing the PFG Bridge Loan.

"PFG Bridge Loan Note" means the promissory note to be given by the Partnership to Paramount if the PFG Bridge Loan is made.

"Plans and Specifications" means the plans and specifications for the Project stamped with the seal of the Inspecting Architect and/or engineer, and any changes thereto made in accordance with the terms of the Loan Agreement and Section 8.2(b).

"Prime Rate" means the prime commercial lending rate as published from time to time by The Wall Street Journal (or any comparable publication or national lending institution designated by the Investor Limited Partner in its reasonable discretion if The Wall Street Journal ceases to publish such index).

"Project" means the land currently owned by the Partnership in Tampa, Florida, and the 132-unit multifamily rental housing development and other improvements to be constructed, owned and operated thereon by the Partnership, and to be known as Fountainview Apartments.

"Project Documents" means all documents evidencing and securing the obligations of the Partnership in connection with Project Loans, the Permanent Commitment, the Construction Contract, the Extended Use Agreement, the Regulatory Agreement, the Management Agreement, the Development Agreement, the Incentive Management Agreement, the Guaranty, the Keepwell Agreement, all other instruments delivered to (or required by) the Project Lenders or the Agency, and all other documents relating to the Project by which the Partnership is bound, as amended or supplemented from time to time.

"Project Lenders" means the Construction Lender, the Permanent Lender, the Subordinate Lender and any other Person who now or hereafter is the holder of a Project Loan.

"Project Loans" means (i) the Construction Loan, (ii) the Bridge Loan, (iii)the PFG Bridge Loan, if applicable, (iv) the Subordinate Loan and (v) the Permanent Loan. The basic terms of the Project Loans are set forth on Exhibit G hereto.

"Projected Credits" means Tax Credits in the amount of $103,967 for 2006, $937,130 for 2007, $1,097,890 for each of the years 2008-2015, $993,923 for 2016 and $160,760 for 2017, which the General Partner has projected to be the total amount Tax Credits which will be allocated to the Investor Limited Partner, constituting ninety-nine and ninety-nine hundredths percent (99.99%) of the Tax Credits which the General Partner has projected will be available to the Partnership as adjusted from time to time to take into account any increase or decrease in Tax

Credits that has been or will be (i.e., from Net Cash Flow or proceeds from a Capital Transaction) compensated for pursuant to Article V or Section 8.8(c).

"Qualified Basis" means the amount of the Eligible Basis in the Project attributable to the units in the Project occupied or deemed occupied by individuals meeting the income limitations of the Minimum Set-Aside Test and whose rental payments are limited by the provisions of the Rent Restriction Test.

"Qualified Economic Occupancy" means the product of (A) 100% and (B) a fraction, the numerator of which is the number of Tax Credit units in the Project that have been leased to Qualified Tenants under executed leases and the denominator of which is the number of Tax Credit units in the Project; provided, however, to the extent that Qualified Economic Occupancy has not occurred as a result of unqualified units that have been or will be accounted for pursuant to the provisions of Sections 5.1(d) and/or 8.8(c), then Qualified Economic Occupancy shall be deemed to have been achieved.

"Qualified Physical Occupancy" means the product of (A) 90% and (B) a fraction, the numerator of which is the number of Tax Credit units in the Project that are physically occupied by Qualified Tenants, and the denominator of which is the number of Tax Credit units in the Project; provided, however, to the extent that Qualified Physical Occupancy has not occurred as a result of unqualified units that have been or will be accounted for pursuant to the provisions of Sections 5.1(d) and/or 8.8(c), then Qualified Physical Occupancy shall be deemed to have been achieved.

"Qualified Tenant" means a tenant (i) with income at the time of the initial lease not exceeding the percentage of area gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than six months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents.

"Regulations" means the regulations promulgated under the Code.

"Regulatory Agreement" means, to the extent applicable, and collectively, any regulatory agreements and/or any declaration of covenants and restrictions to be entered into between the Partnership and any applicable government agency at the Initial Closing (or if thereafter, with the reasonable approval of the Special Limited Partner; provided that such approval is not required for the Extended Use Agreement) setting forth certain terms and conditions under which the Project is to be operated.

"Rent Restriction Test" means the test pursuant to Section 42(g) of the Code whereby the gross rent charged to tenants of the low-income units in the Project cannot exceed thirty percent (30%) of the imputed income limitation of the applicable units.

"Reserve For Replacements" means the Reserve For Replacements to be established by the Partnership and administered in accordance with Section 8.13 of this Agreement, including any funds of the Partnership held by the Project Lenders as a reserve for repairs and replacements.

#3146610_v6                                                - 19 -

"Secretary" has the meaning given it in Section 7701(a)(ii) of the Code.

"Seventy-Five Percent Construction Completion" means the date as of which the Inspecting Architect certifies that the work to be performed by the Contractor under the Construction Contract is, in the aggregate and not on a building by building basis, 75% complete and that at least 75% of hard construction costs have been incurred

"Special Limited Partner" means Protech 2005-C, LLC, an Ohio limited liability company, and any other Person admitted as a Special Limited Partner pursuant to this Agreement, and its or their respective successor(s) pursuant to this Agreement.

"Stabilization" means the date on which the Project has achieved Qualified Economic Occupancy and Qualified Physical Occupancy.

"State" means the State of Florida.

"State Designation" means, with respect to the Project, (i) the allocation by the Agency of Low-Income Housing Tax Credits, as evidenced by the receipt by the Partnership of either a carryover allocation of Tax Credits meeting the requirements of Section 42(h)(1)(E) of the Code and Treasury Regulations or IRS Forms 8609 executed by the Agency as to all buildings in the Project, or (ii) if the Project is being financed in part by the proceeds of tax-exempt bonds and the Project qualifies for the exception described in Section 42(h)(4)(B) of the Code, then the written determination by the Agency and/or Lender that the Project meets the requirements set forth in Sections 42(m)(1)(D) and 42(m)(2)(D) of the Code, and the assignment by the Agency of Tax Credit building identification number(s) with respect to the Project.

"Subordinate Loan" means the anticipated loan to be made by the Subordinate Lender to the Partnership from State Housing Investment Program ("SHIP") in the approximate amount of $300,000 with a 32-year term. At all times after Final Closing, the Subordinate Loan will be nonrecourse to the Partnership or the partners of the Partnership other than standard nonrecourse carveouts as approved by the Special Limited Partner.

"Subordinate Loan Documents" means the Subordinate Loan Note, the Subordinate Loan Mortgage and other related documents executed by the Partnership in connection with the Subordinate Loan, the forms of which are subject to the consent of the Special Limited Partner.

"Subordinate Loan Mortgage" means the mortgage or deed of trust given by the Partnership in favor of the Subordinate Lender as maker of the Subordinate Loan securing the Subordinate Loan.

"Subordinate Loan Note" means the promissory note give by the Partnership to the Subordinate Loan.

"Subordinate Lender" means Hillsborrough County, a body corporate and politic of the State of Florida.

"Substantial Completion" means the later of: (i) the date on which the Investor Limited Partner shall have received copies of all requisite certificates or permits permitting occupancy of

100% of the apartment units in the Project as issued by each Agency having jurisdiction; provided, however, that if such certificates or permits are of a temporary nature, the "Completion Date" shall not be deemed to have occurred unless that work remaining to be done is of a nature which would not materially impair the permanent occupancy of any of such apartment units; or (ii) the date on which the Investor Limited Partner shall have received copies of the certificate of Substantial Completion from the Inspecting Architect.  Any representation submitted by the General Partner that Substantial Completion has occurred shall be subject to confirmation by the Special Limited Partner pursuant to a physical inspection of the Project; provided, however, that in the event that the Special Limited Partner does not make such physical inspection of the Project within ten (10) business days after having received any such General Partners' representation, then the Special Limited Partner will be deemed to have waived the physical inspection requirement.

"Substitute Limited Partner" means any Person admitted to the Partnership as a Limited Partner pursuant to Section 9.3.

"Tax Credits" means the tax credits allowed for low-income housing projects pursuant to Section 42 of the Code.

"Tax Credit Recapture Event" means any of the following events other than a reduction in Eligible Basis, a Tax Law Change, or a transfer by the Limited Partner: (a) the filing of a tax return by the Partnership or an amendment to a tax return by the Partnership evidencing a reduction in the Qualified Basis of the Project causing a recapture or disallowance of Tax Credits previously allocated to the Investor Limited Partner, (b) a reduction in the Qualified Basis of the Project following an assessment or audit by the IRS which results in the assessment of a deficiency by the IRS against the Partnership with respect to any Tax Credits previously claimed in connection with the Project, unless the Partnership shall timely file a protest with the Appeals Office of the IRS or a petition with respect to such deficiency with the United States Tax Court or any other federal court of competent jurisdiction and the collection of such assessment shall be stayed pending the disposition of such protest and petition, (c) a decision by the United States Tax Court or any other federal court of competent jurisdiction upholding the assessment of a deficiency against the Partnership with respect to any Tax Credits previously claimed in connection with the Project, unless the Partnership shall timely appeal such decision and the collection of such assessment shall be stayed pending the disposition of such appeal, or (d) the decision of a federal court of competent jurisdiction affirming such decision.

"Tax Credit Reservation" means the receipt by the Partnership of a credit reservation for Low-Income Housing Tax Credits from the Agency or conditional commitment therefore in the annual amount of $1,098,000.

"Tax Credit Shortfall" means, as to any period of time as evidenced by the Accountant's preparation and the Partners' approval of a tax return or a Final Determination, the difference between the Certified Credit for such period of time and the Actual Credits for such period of time other than as a result of a reduction in Eligible Basis, a Tax Law Change, or a transfer by the Limited Partner, and other than with respect to Tax Credits previously claimed by the Partnership and otherwise provided for herein as a result of a Tax Credit Recapture Event.