# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CREATIVE CHOICE HOMES XXX, LLC,
f/k/a Creative Choice Homes XXX, Inc.,

     Plaintiff,

v.                                Case No: 8:19-cv-1903-TPB-AAS

AMTAX HOLDINGS 690, LLC,
and PROTECH 2005-C, LLC,

     Defendants.
_____ /

CREATIVE CHOICE HOMES XXXI, LLC,
f/k/a Creative Choice Homes XXXI, Inc.,

     Plaintiff,

v.                                Case No: 8:19-cv-1910-TPB-AAS

MG AFFORDABLE MASTER, LLC,
MG GTC MIDDLE TIER I, LLC,
and MG GTC FUND I, LLC,

     Defendants.
_____ /

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In these cases, the limited partners of two different but related limited partnerships seek to remove the general partners from the partnerships.  The general partners decline to leave.  The Court tried both cases together in a three-day bench trial.  Having considered the testimony of the witnesses, the documentary evidence, and the argument of counsel, the Court makes the following

findings of fact and conclusions of law.[1]  The Court concludes that the general

partners committed material breaches of the governing partnership agreements and

violations of their legal duties, and failed to timely cure these breaches and

violations when given the opportunity to do so.  Accordingly, under the terms of the

agreements and applicable law, the limited partners are entitled to declaratory

relief removing the general partners from the partnerships.

## Findings of Fact

### *The Projects, the Parties, and the Partnership Agreements*

1.      The limited partnerships involved in this dispute were formed to

construct and operate commercial apartment complexes in Tampa known as the

Fountainview Apartments and Park Terrace Apartments.  These apartment

complexes offer affordable housing to qualifying tenants and generate tax losses

and credits for the limited partners.  They also generate cash flow and, at the end of

a "compliance period," afford the general partners the option to purchase the

projects or the interests of the limited partners.[2]

Fountainview

2.      Creative Choice Homes XXX, LLC, Plaintiff in Case No. 8:19-cv-1903,

is the general partner of Creative Choice Homes XXX, Ltd., a limited partnership in

which Defendants Amtax Holdings 690, LLC and Protech 2005-C, LLC are the

---

[1] The distinction between a finding of fact and a conclusion of law can be "elusive."  *See, e.g., Miller v. Fenton*, 474 U.S. 104, 114 (1985).  To the extent any of the Court's findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.
[2] "The compliance period" refers to a fifteen-year period during which the projects must offer affordable housing for the tax benefits to remain valid.

"Investor Limited Partner" and "Special Limited Partner," respectively.  The partnership will be referred to as "Fountainview" or the "Fountainview partnership."  Creative Choice Homes XXX, LLC, will be referred to as "CCH XXX" or as the "General Partner."  Amtax Holdings 690, LLC and Protech 2005-C, LLC, will be referred to as "Amtax" and "Protech," or together as the "Limited Partners."

3.     CCH XXX is a limited liability company organized under Florida law. Dilip Barot is the sole member.  CCH XXX has no employees of its own.  Barot, however, also co-owns Creative Choice Homes, Inc., which provides various management services to CCH XXX, and he founded and controls Counterdefendant Impro Synergies, LLC ("Impro"), which provides property management services to the Fountainview partnership.[3]

4.     Since 2018, the Fountainview Limited Partners have been owned and controlled in whole or in part by one or more entities affiliated with Hunt Companies, Inc., a Texas real estate investment corporation.  Hunt Capital Partners, LLC, represents and manages the interests of the limited partners.

5.     The parties' relationship is governed by a partnership agreement dated December 21, 2005 (the "Fountainview Agreement").

---

[3] The parties agreed at trial that Impro is an affiliate of the General Partners.  Accordingly, upon the General Partners' removal, Impro's contracts as property manager are either automatically terminated or subject to termination by the General Partners.  The General Partners can also terminate Impro on 30 days' notice with or without cause.  The Limited Partners seek to remove Impro as of 30 days from the date of judgment removing the General Partners.

6.      The Fountainview Agreement gives the General Partner exclusive control and management of the day-to-day operations of the partnership.

7.      The Agreement requires the General Partner to distribute "Net Cash Flow" by a certain date each year in a specific order.  Under this "waterfall" provision, the General Partner must pay various loans and fees, including certain fees and other amounts owed to the Limited Partners, prior to distributions of the remaining cash, 99.99% to the General Partner and .01% to the Investor Limited Partner.

8.      The Agreement provides that the General Partner lacks authority to "borrow from the Partnership or commingle Partnership funds with funds of any other Person" and, absent consent of the Special Limited Partner, lacks authority to "borrow more than $10,000.00 in the aggregate at any one time outstanding on the general credit of the Partnership," subject to certain exceptions.

9.      The Agreement requires the General Partner to furnish the Limited Partners with audited financial statements for each year by March 15 of the following year, and to furnish other tax-related information by March 31, to allow the Limited Partners to prepare their own tax returns.  Failure to comply with these reporting deadlines allows the Limited Partners by written direction to impose liquidated damages of $100 per day until the required information is provided.  This late reporting fee, however, may be waived if the failure to comply was due to matters outside the control of the General Partner and accountants and certain other requirements are met.

10.     The Agreement provides that Protech, as the Special Limited Partner,

can remove the General Partner, as follows:

### 8.15    Removal of the General Partner

(a)     The Investor Limited Partner and/or the Special Limited Partner shall have the right to remove the General Partner:

(i)     For any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership), or

(ii)   upon the occurrence of any of the following:

. . .

(B)     The General Partner shall have violated any material provision of this Agreement, including without limitation, any of its guarantees pursuant to Sections 5.1(d) or 8.8, or violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership);

. . .

11.     The General Partner must receive notice and an opportunity to cure

before removal:

(b)     The Special Limited Partner shall give Notice to all Partners of its determination that cause for removal of the General Partner exists hereunder.  The General Partner shall have thirty (30) days after the date of such Notice to cure any default or other reason for such removal, plus an added sixty (60) days if the General Partner begins to cure the default within the thirty (30) day period and diligently and continuously pursues the cure, in which event it shall remain as General Partner.  If, at the end of thirty (30) days, as extended, the General Partner has not cured any default or other reason for such removal, it shall, upon Notice from the Special Limited

Partner, unless the General Partner within thirty (30) days of such notice contests such removal in  a court of competent jurisdiction, cease to be General Partner and the powers and authorities conferred on it as General Partner under this Agreement and shall cease and the Interests of such General Partner shall be transferred to a designee of the Special Limited Partner which, without further action, shall become the General Partner. Upon becoming the General Partner, such designee shall be bound by all applicable terms and conditions of this Agreement and the Project Documents.

12.     After the compliance period, the General Partner has the option to purchase the project for the greater of (i) the outstanding indebtedness on the project (subject to some exceptions) and (ii) the project's fair market value as of the date of closing of the buyout.  Alternatively, the Agreement states that the General Partner can purchase the interests of the Limited Partners for the "amount the Limited Partners would otherwise receive pursuant to the terms of this Agreement under Section 11.4 if the Project were sold at the price described immediately above in clause (i) and assuming reasonable costs of sale . . ."  Section 11.4 of the Agreement provides for an order of distribution for sale proceeds, with proceeds going first toward various loans and fees, and "with respect to all remaining amounts:  ten percent (10%), up to $10,000 to the Special Limited Partner, with any remainder of such 10% to the Investor Limited partner, and ninety percent (90%) to the General Partner."

13.     If the General Partner is removed, then it no longer has the option to purchase the project or the Limited Partners' interests, but it is entitled to receive its positive Capital Account balance, if any, "following a deemed sale of all Partnership property for fair market value subject to all applicable use restrictions,

and a deemed liquidation of the Partnership (but prior to any deemed distributions upon liquidation)," along with certain fees and other amounts, less any adverse consequences caused by the General Partner's conduct.

<u>Park Terrace</u>

14.    Creative Choice Homes XXXI, LLC, Plaintiff in Case No. 8:19-cv-1910, is the general partner of Creative Choice Homes XXXI, Ltd., a limited partnership in which Defendants MG GTC Middle Tier I, LLC, and MG Affordable Master, LLC, are the "Investor Limited Partner and "Special Limited Partner," respectively. This partnership will be referred to as "Park Terrace" or the "Park Terrace partnership."  Creative Choice Homes XXXI, LLC, will be referred to as "CCH XXXI" or the "General Partner."  MG Affordable Master, LLC, and MG GTC Middle Tier I, LLC will be referred to as "MG Affordable Master" and "MG GTC Middle Tier," respectively, or together as the "Limited Partners."[4]

15.    CCH XXXI is a limited liability company organized under Florida law. Dilip Barot is the sole member.  CCH XXXI has no employees but Barot's company Creative Choice Homes, Inc., provides various services, and Impro provides property management services.

16.    Since 2018, the Park Terrace Limited Partners have been owned and controlled in whole or in part by one or more entities affiliated with Hunt

---

[4] CCH XXXI's complaint also named another entity, MG GTC Fund I, LLC, as a defendant but it appears undisputed that this entity is not a limited partner.  Accordingly, MG GTC Fund I, LLC, is dismissed as a party.

Companies, Inc.; Hunt Capital Partners, LLC, manages and represents their interests.

17.     The parties' relationship is governed by a partnership agreement dated January 1, 2007 (the "Park Terrace Agreement").

18.     The Park Terrace Agreement gives the General Partner exclusive control and management of the day-to-day operations of the partnership.

19.     Like the Fountainview Agreement, the Park Terrace Agreement contains a "waterfall" provision that requires the General Partner to distribute cash flow each year by a certain date in a certain order.  Various amounts, including defined amounts owed to the Limited Partners and General Partners, must be paid prior to distribution of "[t]he balance to be paid 99.8% to the General Partner, .01% to the Special Limited Partner, and .01% to the Investor Limited Partner."

20.     Under the Park Terrace Agreement, the General Partner has no authority without the consent of the Special Limited Partner to "[p]ay any salary, fees or other compensation to a General Partner or its Affiliates except as authorized by Section 4.6 or Articles 5 and 8 hereof, or as otherwise specifically provided for in this Agreement" or to "[e]xtend the Partnership's credit, make loans or become a surety, guarantor, endorser, or accommodation endorser except in connection with negotiating checks or other instruments received by the Partnership and accounts payable in the ordinary course of business."

21.     The Agreement requires the General Partner to furnish to the Limited Partners audited financial statements and other and tax-related information within

60 days of the end of each fiscal year.  Failure to comply allows the imposition of liquidated damages of $100 per day on the General Partner, starting on the tenth day after the General Partner receives notice of the failure to furnish the information.  The penalty does not apply, however, if the failure was beyond the reasonable control of the General Partner.

22.     Under the Park Terrace Agreement, the Special Limited Partner, MG Affordable Master, can remove the General Partner for uncured "Material Defaults," defined to include:

(i)     a breach by any General Partner . . . in the performance of any of its obligations under this Agreement . . . and which has, or may reasonably be expected to have, a material adverse effect on the Partnership, the Apartment Complex, or the Investor Limited Partner
. . . .

(iv)    gross negligence, fraud, willful misconduct, misappropriation of partnership funds, or a breach of fiduciary duty by a General Partner . . .

23.     Material Defaults under subsection (i) above, but not under subsection (iv), are subject to a right to cure following notice of the default:

C.      Removal Procedure.  In the event that the Special Limited Partner determines to remove any General Partner pursuant to the provisions of this Section 12.7, the Special Limited Partner shall notify the General Partner in writing of the Material Default that is the cause for the removal of the General Partner . . .  In the case of any Material Default described in clauses (i) or (ii) of Section 12.7B above, the General Partner shall have thirty (30) days from the Removal Notice Date to cure the Material Default; *provided, however*,  that if a non-monetary Material Default cannot be reasonably cured within thirty (30) days, the General Partner shall not be removed if the General Partner commences such cure within thirty (30) days and proceeds in good faith to cure continuously and diligently thereafter, provided that the cure is completed within ninety (90) days following the Removal Notice Date . . . and the failure to cure such Material Default within a shorter period does

not have a material adverse effect on the Partnership, the Apartment Complex or the Investor Limited Partner. . . . If no cure right is afforded under the terms hereof, the removal of the General Partner shall be deemed to be effective as of the date of the Removal Notice; otherwise, such removal shall be effective upon the conclusion of the applicable cure period without a cure of such Material Default reasonably acceptable to the Investor Limited Partner. The General Partner shall have no right to cure any other Material Default described in Section 12.7B above.

24.    The General Partner has the option at the end of the compliance period to purchase the Park Terrace apartment complex from the partnership for the greater of (i) the outstanding indebtedness on the complex (plus taxes imposed on the limited partners) and (ii) its fair market value. Alternatively, the Agreement states that the General Partner can purchase the interests of the Limited Partners for the "amount the Limited Partners would otherwise receive pursuant to the terms of this Agreement under Section 9.2 if the Apartment Complex were sold at the price described immediately above in clause (i) or (ii) above as applicable . . . ." Section 9.2 provides for a distribution of sale proceeds in a certain order, with proceeds going first toward various loans, fees, and distributions, with "[t]he balance, if any, 10% to the Investor Limited Partner, 0.01% to the Special Limited Partner and 89.99% to the General Partner."

25.    As with Fountainview, if the General Partner is removed, then it loses its purchase option, but is entitled to receive its positive Capital Account balance, if any, "following a deemed sale of all Partnership property for fair market value subject to all applicable use restrictions, and a deemed liquidation of the Partnership (but prior to any deemed distributions upon liquidation)," along with

certain fees and other amounts, less any adverse consequences caused by the General Partner's conduct.

### *The General Partners' Breaches of Duty*

26.     From the inception of these two partnerships, the General Partners have engaged in what might charitably be called loose business practices, transferring funds out of these partnerships to be used for their own, non-partnership purposes, including funding other projects in which Barot has an interest.  The General Partners essentially used these two partnerships as their own private banks, informally borrowing funds for their own purposes and repaying them on their own schedule.

27.     These withdrawals were disclosed each year by the General Partners to Baker Tilly, the partnerships' auditors, and referenced in the financial statements furnished to the Limited Partners as amounts "due from affiliate."  The Limited Partners complained on multiple occasions that this conduct violated the partnership agreements and demanded that any amounts transferred out be paid back into the partnerships.  The General Partners at times returned some funds to the partnerships, only to withdraw funds again afterwards.[5]

28.     The General Partners also repeatedly failed to pay the Limited Partners amounts that were owed under the partnership agreements' "waterfall" provisions and instead distributed funds to themselves or to affiliates contrary to

---

[5] To the extent the General Partners argue that the Limited Partners cannot seek removal because they failed to do so on earlier occasions, based on theories of waiver, estoppel, or modification of the agreements, the Court finds that no such waiver, estoppel, or modification occurred.

the required order.  They routinely failed to furnish the required financial information on time, although the information was ultimately provided.

29.    The General Partners have admitted that the foregoing conduct occurred and that it violated the partnership agreements, although they argue the breaches were not material and describe them as "technical."  They also assert that the improper distributions were partially attributable to the Limited Partners' (under the previous management) allowing the General Partners to accrue certain fees otherwise payable each year to the Limited Partners.

30.    The General Partners knew that withdrawing funds from the partnership and transferring them to third parties for non-partnership purposes without permission violated the partnership agreements.  Mr. Barot admitted at trial that this conduct is something that should not have happened.  Given the clear terms of the governing agreements and the testimony at trial, the Court finds that the General Partners' actions with respect to the affiliate loans were intentional and willful.

### *The Naimisha Construction Notes*

31.    The audited financial statements for 2016 for Fountainview showed a "due from affiliate" balance of $140,577, and noted that an affiliate of the General Partner had committed to repay this balance by the end of 2017.  The financial statements for Park Terrace showed a due from affiliate balance of $81,196.

32.    The balance for Fountainview was not repaid as promised.  In 2018, Baker Tilly advised the General Partner that this balance was material and could

not be shown as an asset on the financial statements for 2017 because it was not supported by a note with definite repayment terms.  Baker Tilly believed that the receivable had to be treated as "contra-equity."  The Limited Partners did not agree with this proposed treatment, and wanted the balance reflected instead as a prohibited distribution to the General Partner.

33.    Almost two months later, with this issue unresolved and the financial statements not yet issued, the General Partner adopted a different solution – it would satisfy Baker Tilly's concerns by producing notes with defined repayment terms payable to the partnerships from Naimisha Construction, a company co-owned by Barot, in the amount of $100,000 for each project.  This apparently satisfied Baker Tilly and the audited financial statements for 2017 issued in September 2018, showing a note from Naimisha as "note receivable, affiliate" with a remaining balance of $87,883 and no due from affiliate balance.  The Park Terrace financial statements showed the Naimisha note with a $100,000 balance and a due from affiliate balance of $3,261.

34.    Baker Tilly had suggested in early 2017 that a note be put in place to cover an affiliate balance on the 2016 financial statements for Fountainview, but the Court finds that the notes created by the General Partners in 2018 were misleading in multiple respects.  For example, they purport to have been executed on October 10, 2017, but the first evidence of their existence appears in August 2018, and Naimisha's president, Yashpal Kakkar, testified that he signed the notes

around that time.  The notes therefore appear to have been backdated to look like they were signed in 2017 when they were not.

35.     The notes reflect advances of $100,000 to Naimisha in connection with each project, but neither Barot, Naimisha's co-owner, nor Kakkar, its president, could recall any such advances being received and no evidence was presented that they were.

36.     The notes state the $100,000 payments were made so that Naimisha would, before the end of 2018, prepare a scope of work for repairs to each project.  If the repairs were authorized, Naimisha would perform the work and apply some or all of the funds as payment.  Kakkar, however, had no recollection of any such obligations on the part of Naimisha and he signed the signature page of each note without even seeing the body of document.  Although Barot testified that Naimisha prepared a scope of work, no scope of work was offered as evidence.

37.     Naimisha promised to pay off the balance of both notes by the end of December 2018, but it did not do that, either.  Although financial statements for 2018 showed no balance remaining on the Park Terrace note, $87,562 remained outstanding on the Fountainview note.

38.     The Court concludes that the notes and the advances to Naimisha they purport to reflect were manufactured in August 2018 and backdated to October 2017 to solve the General Partners' accounting problem without having to admit what was really going on – the due from affiliate balances represented improper

distributions to the General Partners or third parties for non-partnership purposes.

39.     The Naimisha Construction notes and the affiliate balances contributed to the Limited Partners' decision to demand that the General Partners comply with their agreements or face removal, and it therefore appears the Limited Partners never detrimentally relied on the notes' misrepresentations.  Their creation, however, reveals that the General Partners were less than honest with respect to partnership funds and bookkeeping matters.

### *The Limited Partners' Notices of Default and Removal*

40.     On March 25, 2019, the Limited Partners demanded in writing that all affiliate loans be paid back into the partnerships, that improper distributions to the General Partners be paid back, and that the Limited Partners be paid distributions owed by the partnership.  The General Partners did not respond.  The Limited Partners repeated their demands on April 15, 2019, in letters from their counsel, along with a demand for financial reports that were overdue.  Once again, the General Partners did not respond.

41.     On May 3, 2019, the Limited Partners gave the General Partners notices of default, demanding that the General Partners cure the defaults by June 3, 2019, to avoid removal.  On June 3, 2019, the General Partners' counsel e-mailed the Limited Partners that the General Partners planned to make loans to the partnerships to fund payments to the Limited Partners and requested another seven days in which to do so.  The Limited Partners did not agree to the extension

and in any event the requested seven days passed with no payment and no evidence of cure regarding any of the defaults.

42.     On June 18, 2019, the Limited Partners notified the General Partners in writing that they were removed from the partnerships.  The next day, the General Partners' counsel emailed the Limited Partners that they were prepared to wire $105,994 (for Fountainview), and $ 141,235 (for Park Terrace) "in satisfaction of the amounts claimed, and currently due" if the Limited Partners would withdraw the removal notices.  Finally, on June 21, 2019, the General Partners sent the checks by Federal Express.

### *The General Partners' Failure to Cure*

43.     Barot testified that when he learned of the Limited Partners' assertions and demands he immediately directed Ashok Kumar to investigate and rectify the matter.  Kumar was an officer at Creative Choice, Inc., and worked with Impro to provide management services to the General Partners.  Kumar, however, passed away in March 2021 and his deposition was not taken.  Aside from Barot's testimony that he directed Kumar to investigate, and deposition testimony from Baker Tilly regarding a calculation they helped prepare, there is little evidence on what steps the General Partners took or when they took them.  Kumar stated in a May 28, 2019, email that he had worked on the issue the previous week and had calculated the payments to be made to the Limited Partners.  He stated that the General Partners should be prepared to make the payments by May 30, 2018, but this did not occur, probably because the partnerships lacked the necessary funds.

44.     A central dispute at trial centered on whether the source of funds for the June 21, 2019, payment as to Fountainview was a simple infusion of cash from Creative Choice Homes, Inc., or instead involved loans to the partnership, which would violate the partnership agreement and fail to cure the default.  As noted above, the General Partners' counsel on June 3, 2019, told the Limited Partners that the source of the forthcoming payments would be loans to the partnerships. Barot testified at trial that the source of the payments included a deposit of $77,000 into the Fountainview partnership's bank account transferred from the bank account of his company, Creative Choice Homes, Inc.  Internal documentation as well as trial testimony by Kakkar identified that same amount as a loan.  Kakkar similarly identified a deposit of $116,000 to the Park Terrace partnership's account as a loan to fund the payment to the Limited Partners.

45.     Baker Tilly's records relating to their audit for 2019 show a loan of $54,500 to the Fountainview partnership from Impro and reflect a statement by Kumar that the purpose of the Impro loan was to cover outstanding distributions to the Limited Partners.  Ryan Trezek, a senior manager with Baker Tilly who worked on the audits, testified in deposition that the source of the funds used to make the payment appears to have been an Impro loan.  The General Partners' interrogatory answers in this litigation stated that Impro was the sources of the source of funds used to make the payments.

46.     Considering the foregoing evidence, the Court does not credit Barot's testimony that the funds to cover the payments to the Limited Partners were funds wired from Creative Choice, Inc., with no loans involved.

47.     As to Park Terrace, the evidence showed that improper cash advances to affiliates continued in 2019 even after the May 3, 2019, notice of default, and these withdrawals were not paid back until November 2019.  Kumar directed that deposits made that month to eliminate these receivables be recorded as having been made in September, but even September would have been well beyond any cure period.

### *The Parties' Claims and Counterclaims*

48.     The Limited Partners advised the General Partners that they expected an orderly transition to new general partners.  The General Partners refused to relinquish control of the partnerships or the properties and on July 5, 2019, filed the instant lawsuits against the Limited Partners in state court, which the Limited Partners removed to this Court.

49.     In both cases, the General Partners seek a declaration that no circumstance authorizing their removal existed and that the Limited Partners' June 18, 2019, removal notices were null and void.  The General Partners also assert claims for breach of contract, seeking damages and an injunction preventing further efforts by the Limited Partners to remove them and compelling their compliance with obligations under the partnership agreements.  In the Fountainview case, CCH XXX requests a declaration that the cure period was extended until August 3,

2019, and an injunction directing the Limited Partners to give it an opportunity to cure until that date. [6]

50.     The Limited Partners answered the complaints, and they assert counterclaims for breach of contract based on the General Partners' making of prohibited affiliate loans, misapplying cash flow, and failing to provide the required financial reporting.  They seek damages and all other legal or equitable relief to which they are entitled, including specific performance.  They also assert claims for breach of fiduciary duty based on the same conduct and seek similar relief on those claims.  Finally, they seek a declaratory judgment that they had the right to remove and did properly remove the General Partners and that Impro has been terminated as the management company.

### *Materiality of the Claimed Breaches*

51.     In the ensuing litigation, the General Partners first denied they had done anything wrong, but ultimately admitted they had breached the partnership agreements.  Their principal contention to avoid removal is that the breaches were not sufficiently "material" because the amounts misappropriated were small in comparison with the value of the projects and overall tax benefits accruing to the Limited Partners over the years, and that their removal as General Partners would

---

[6] At trial, both sides moved for judgment as a matter of law.  The Court denied the General Partners' motion, granted the Limited Partners' motion as to the General Partners' contract claim, and otherwise deferred ruling.  The Court has by separate order denied the Limited Partners' motion as to the remaining claims.  The Court has also considered the General Partners' contract claim under all the evidence at trial and again concludes the Limited Partners did not breach their agreements.

result in a disproportionate and inequitable forfeiture of their right to purchase the Limited Partners' interests and obtain full ownership of the projects.

52.     In that regard, the Court finds that while the amounts of improper cash withdrawals over the years amounted to a small fraction of the Limited Partners' overall economic benefit in terms of tax credits and savings, they constituted a substantial portion of the cash available to the projects in some years. Baker Tilly concluded in 2016 that they had become material from an auditing perspective.  Barot admitted that he considered the amount of some of the affiliate balances to be material.  It was important from the Limited Partners' perspective that funds remain in the partnership throughout the year in order to be available for emergencies and other unexpected events that might arise during the year. Based on the amounts involved, as well as the nature of the General Partners' conduct, the Court finds the General Partners' improper withdrawals of cash to be material under the standards discussed in the conclusions of law below.

53.     On the issue of the loss of the General Partner's purchase option rights, both sides agreed to rely on written expert reports in lieu of live testimony. As to Fountainview, the General Partners' expert Stephen Sheridan opines that, if not removed as General Partner, CCH XXX would be entitled to purchase the Limited Partners' interests for $196,477 based on an estimated property value of $5,713,000.  After deducting for debts and costs, Sheridan calculates that would leave the General Partner with equity with a present value of $1,997,797 as of June

19, 2019.  On the other hand, Sheridan opines that if the General Partner is removed, it would likely receive little or nothing based on its Capital Account.

54.     As to Park Terrace, Sheridan opines that if not removed, the General Partner would be entitled to purchase the Limited Partners' interests for $642,980, based on an estimated property value of $11,949,000.  After deducting for debts and costs, that would leave the General Partner with equity of about $5,245,063.  On the other hand, if the General Partner were removed, it would receive little or nothing.

55.     The Limited Partners' expert, Niccolo Pinoli, does not take issue with Sheridan's contention that the General Partners would receive very little if removed, nor with the fair market value Sheridan posits for each of the projects. Pinoli asserts, however, that the purchase price the General Partner would have to pay to exercise its option at both Fountainview and Park Terrace would be far greater than that calculated by Sheridan.

56.     The Court is not persuaded by the written expert testimony submitted by either side, and therefore makes no finding of fact or conclusion of law regarding the operation and consequences of the General Partners' exercise of their purchase price option as compared to receiving the required payments upon removal.  The Court will instead assume for purposes of these findings and conclusions that the General Partners' position is correct.

57.     The General Partners also argue that Hunt Capital Partners has acted with an improper motive and as part of a campaign to improperly oust general partners of affordable housing projects in order to acquire their equity.  To the

extent the motive of Hunt Capital Partners is relevant in these cases, the Court finds that the General Partners' contentions were not supported by the evidence presented at trial.

### *Liquidated Damages*

58.     As set forth above, the partnership agreements provide for liquidated damages of $100 per day for the General Partners' late provision of financial information.  The Limited Partners claim that from 2016 to 2020 the General Partners were late in furnishing the required information and seek to recover $136,000 in late fees for Fountainview and $92,800 in late fees for Park Terrace.

59.     The evidence at trial has persuaded the Court that the General Partners breached their respective partnership agreements by late reporting of financial information.  However, as discussed below in the Court's conclusions of law, the claim for liquidated damages was not preserved in the parties' pretrial statement and has been waived.  Even if this claim were properly in the case, the evidence was insufficient to persuade the Court that the Limited Partners themselves did not contribute to the delays, that contractual requirements for an award of liquidated damages were met, and that the amounts sought by the Limited Partners are correct.  Accordingly, the Limited Partners did not sustain their burden of proof on this issue.

### *Loss of Value Due to Mismanagement*

60.     The Limited Partners also seek damages for a loss of value of the two properties alleged to have been caused by the General Partners' mismanagement, in

the amount of $8,287,000 for Fountainview and $12,051,000 for Park Terrace.  The Limited Partners failed to present evidence at trial sufficient to convince the Court that the properties declined in value as alleged or that any such diminution in value was caused by the actions of the General Partners.

## Conclusions of Law

### *Jurisdiction*

1.      The Plaintiffs in these two cases are limited liability companies whose sole member is a citizen of Florida.  The Defendants are limited liability companies whose members are citizens of states other than Florida.  The amount in controversy exceeds $75,000.  The Court has subject matter jurisdiction over these cases.  *See* 28 U.S.C. § 1332.

### *Elements of the Parties' Claims*

2.      The General Partners and Limited Partners in each case assert claims for breach of contract.  A breach of contract claim requires proof of a valid contract, breach of duty under the contract, and damages.  *See, e.g., Everglades Ecolodge at Big Cypress, LLC v. Seminole Tribe of Fla.*, 836 F. Supp. 2d 1296, 1302 (S.D. Fla. 2011); *see also Muroff v. Dill*, 386 So. 2d 1281, 1283-84 (Fla. 4th DCA 1980) (holding that a party who establishes a breach of contract is entitled to at least nominal damages).  There is no dispute in these cases as to the existence of valid contracts, breaches of duty, or damage.  The issue is whether the breaches were sufficient to support removal of the General Partners.

3.      Breach of fiduciary duty is a ground for removal under the partnership agreements and the Limited Partners also assert a separate claim for breach of fiduciary duty.  A claim for breach of fiduciary duty requires the existence of a fiduciary relationship, breach of a duty owed under that relationship, and proximately resulting damages.  *See, e.g., Jackson Nat'l Life Ins. Co. v. Sun Coast Trust Co.*, No. 8:18-cv-401-23AAS, 2019 WL 1787491, at *7 (M.D. Fla. Apr. 24, 2019).  If a plaintiff cannot prove actual damages, nominal damages may be recovered.  *Id.*  Here, too, the disputed issue is whether the General Partners' admitted conduct in violation of the partnership agreements rose to the level of a breach of fiduciary duty.

4.      To obtain a declaratory judgment, there must be an actual controversy, and the party seeking the judgment must prove that he or she is in doubt as to the existence of some right and is entitled to have the doubt removed.  28 U.S.C. § 2201(a); *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, No. 6:06-cv-1757-Orl-GJK, 2008 WL 11338611, at * 4 (M.D. Fla. Apr. 1, 2008).   There is no dispute here that a declaration of the parties' rights is appropriate in these cases.

### *General Partners' Breaches of Duty*

5.      By making unauthorized withdrawals and loans from the partnerships to their affiliates, CCH XXX and CCH XXXI breached express contractual prohibitions against unauthorized loans.  As general partners of a limited partnership, CCH XXX and CCH XXXI owed their limited partners fiduciary duties

of care and loyalty. *Carolina Preservation Partners, Inc. v. Wolf Arbin Weinhold*, 414 B.R. 754, 762 (M.D. Fla. 2009). A fundamental aspect of the duty of loyalty is that a partner may not divert partnership assets to non-partnership uses. *See, e.g., Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So. 2d 459, 462 (Fla. 3d DCA 2004) ("[A]s a matter of law, a joint adventurer . . . owes a fiduciary duty to the other partners not to open a competing restaurant and not to divert assets of the joint venture to that competing restaurant."); *Carolina Preservation Partners,* 414 B.R. at 761 (holding that, under Florida law, "a partner may not divert partnership assets for non-partnership purposes").

6.      By diverting partnership funds to other projects in which Barot had an interest, the General Partners improperly acted to benefit, not the partnership, but themselves or third parties. They thereby breached their fiduciary duty of loyalty. *See Carolina Preservation Partners*, 414 B.R. at 761.

7.      Based on the findings of fact above, the Court concludes that the actions of CCH XXX with respect to affiliate loans at Fountainview constituted intentional misconduct, malfeasance, acts outside the scope of its authority, and breaches of its fiduciary duty to the partnership, each of which is a ground for removal. The Court similarly concludes that the actions of CCH XXXI with respect to affiliate loans at Park Terrace constituted willful misconduct, misappropriation of partnership funds, and breaches of its fiduciary duty to the partnership, each of which is a ground for removal.

*Materiality*

8.      As to Fountainview, for the reasons set forth in the Court's Order denying Creative Choice Homes XXX's motion for summary judgment, in order to remove the General Partner, the Limited Partners must establish that the breaches of duty at issue resulted in, or were likely to result in, a material detriment to or an impairment of the partnership, the Limited Partners, the project, or the assets of the partnership.

9.      As to Park Terrace, breaches of contractual obligations are grounds for removal of the General Partner only if they have or may reasonably be expected to have, a material adverse effect on the Partnership, the Apartment Complex, or the Investor Limited Partner.  However, the Court has found the General Partner committed willful misconduct, misappropriation and breach of fiduciary duty, which are not subject to an express materiality limitation.  The Court need not decide whether the law nevertheless requires consideration of materiality even with respect to the latter conduct, because it concludes that the breaches of duty in these two cases were material.

10.      The agreements do not define "material adverse effect" or "material detriment or impairment."  "Material" means "significant" or "important."  *Black's Law Dictionary* defines "material" as "[o]f such nature that knowledge of the item would affect a person's decision-making; significant; essential."  A. Garner, *Black's Law Dictionary* 1124 (10th ed. 2014).  "Adverse effect," "detriment," and "impairment" all mean essentially the same thing.  A common sense reading of the

agreements' materiality language, then is: "likely or reasonably expected to have an significant or important adverse effect."

11.    As discussed above, while the amounts of money involved here were not large by some possible measures, they were substantial by other measures.  For example, the improper withdrawals of cash issue here involved thousands of dollars, approaching or exceeding $100,000 in some years, and represented at times a substantial portion of the partnerships' available cash.  The agreements do not dictate that the "material adverse effect" or "material impairment or detriment" be measured only by comparing the amount misappropriated to the value of the property as a whole or the overall economic benefit to the Limited Partners.  As noted above, the Court finds the amounts involved to be material.

12.    The agreements also do not dictate that the amount of money taken from the partnerships is the sole consideration.  The General Partners repeatedly, intentionally, and willfully diverted thousands of dollars to non-partnership uses, over the objection of the Limited Partners, in violation of their duties as General Partners.  Such conduct by its nature is likely to have or could reasonably be expected to have a material adverse or detrimental effect on the partnerships because it affects the relationship of the partners.  The General Partners' conduct has damaged the Limited Partners by depriving them of distributions they were owed and by rupturing the partnership relationship.

13.    Both sides point to contract law standards for determining whether a breach is material, offering substantially similar definitions.  The Court concludes

that the General Partners' misconduct was material under these standards as well. A breach is material when it goes to the essence of the parties' agreement, deprives the non-breaching party of substantially what it bargained for, and is of such significance that it relieves the non-breaching party of its duty to perform the contract.  *See, e.g., Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015).  In determining whether a breach is material, courts also look to, among other things, the extent to which an award of damages would adequately compensate the non-breaching party for the benefit of which it was deprived, the extent to which terminating the contract will lead to forfeiture, and the extent to which the breaching party acted consistently with the duty of good faith and fair dealing.  *See Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989).

14.    The Limited Partners had the right to expect more than just the tax benefits and cash flow they bargained for.  They also properly expected that in managing these projects the General Partners would adhere to their most basic fiduciary duties by refraining from diverting partnership funds to their own, non-partnership purposes.  The General Partners' conduct deprived the Limited Partners of that substantial, bargained-for benefit.  At this point, given the nature of the General Partners' conduct and the antagonistic relationship of the parties, an award of damages would not adequately compensate the Limited Partners.  They should not be required to continue in this relationship with the General Partners.

15.     The General Partners argue that enforcing their agreements would result in an inequitable forfeiture of millions of dollars in equity potentially available if they were allowed to remain in the partnerships and exercise their purchase options.  Assuming that is the case, the Court concludes that this consideration is outweighed by the nature of the General Partners' misconduct and their lack of good faith in managing these partnerships.

16.     Additionally, the remedy of removal, with its attendant consequences, is provided for by the parties' agreements, and any loss of equity will have resulted from the General Partners' failure to comply with the terms of those agreements and their legal responsibilities, matters which were within their own control. Under these circumstances, the Court is not required to relieve the General Partners of the results of their conduct.  *See Stoltz v. Truitt*, 940 So. 2d 521, 523 (Fla. 3d DCA 2006).

17.     Accordingly, under the agreements' plain language and the standards supplied by the parties, the Court concludes the General Partners' violations were material and will not result in an impermissible or inequitable forfeiture.

### *Notice and Opportunity to Cure*

18.     As to Fountainview, the General Partner had 30 days from the notice of default to cure the claimed defaults in order to avoid removal, and failed to cure within that time.  The Fountainview Agreement provides for an additional 60 days if the General Partner within 30 days began to cure and then diligently pursued a cure, but even if the deadline was extended until August 3, 2019, no cure occurred

by that time.  As set forth in the Court's findings of fact, the purported cure by the General Partner in the form of a check to the Limited Partners was funded by one or more loans to the partnership.  As a matter of law, this constituted a further breach of the partnership agreement, not a cure for the existing breaches.

19.     The Park Terrace Agreement provides no right to cure with respect to willful misconduct, misappropriation of partnership funds, or breach of fiduciary duty, which the Court has found occurred here.  Although the Limited Partners allowed the General Partner to cure by June 3, 2019, there was no cure by that date.  The June 21, 2019, payments to the Limited Partners, funded by loans to the partnership, came too late, and the General Partner continued to withdraw funds from the partnership that were not paid back until late in 2019.

### *Relief Awarded*

#### Removal of the General Partners

20.     For the reasons set forth above, the Limited Partners are entitled to a declaration that Creative Choice XXX, LLC and Creative Choice XXXI, LLC, are removed as General Partners of the Fountainview and Park Terrace partnerships, respectively.  The removal is effective as of the date of entry of the Court's judgment.

#### Liquidated Damages

21.     The partnership agreements provide for penalties on the General Partners of $100 per day for late provision of financial information required to be furnished each year to the Limited Partners.  The Court declines to award these

damages because the Limited Partners did not in the pretrial statements provide the required breakdown of these damages by "type and amount" so as to allow the General Partners to prepare to defend against these claims at trial. Accordingly, the Court finds that any claim for these amounts was abandoned or waived prior to trial. In addition, as set forth in the findings of fact above, the Court has found that the Limited Partners have not presented sufficient evidence to convince the Court that these damages are awardable.

<u>Loss of Value</u>

22.     In the pretrial statements in these cases, the Limited Partners asserted a claim for loss of value of the two projects due to mismanagement by the General Partners, in the amount of approximately $8 million for Fountainview and $12 million for Park Terrace. The General Partners objected at the pretrial conference that they were surprised by these claims, although they never moved to strike the claims or exclude any evidence. It does not appear that a claim for general mismanagement of the partnerships was pled by the Limited Partners. Even if these claims were properly in the case, as discussed above in the Court's findings of fact, the Limited Partners failed to present evidence at trial sufficient to convince the Court that the properties declined in value as alleged due to mismanagement by the General Partners.

***Consequences of Removal***

23.     As set forth above, the Court has assumed for purposes of these findings of fact and conclusions of law that the General Partners' contentions

regarding the value of the properties and the economic consequences of their removal in terms of a loss in potential equity in the projects are correct. The Court, however, makes no findings in that regard nor are findings on these matters necessary to the Court's judgment. The Court's judgment accordingly concludes the issues of removal, liquidated damages, damages for loss of value, and the other points discussed herein. The amount of any payments by the Limited Partners required as a result of removal of the General Partners and other steps required by the parties' agreements upon removal remain to be determined either by agreement of the parties or, if necessary, in subsequent litigation.

### *Attorney's Fees and Non-Taxable Costs*

24.    As agreed at trial, following entry of judgment, the Limited Partners may file a motion for entitlement to attorney's fees and non-taxable costs pursuant to Local Rule 7.01.

It is therefore

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) As to Case No. 8:19-cv-1903, the Clerk is directed to enter judgment in favor of Defendants, Amtax Holdings 690, LLC, and Protech 2005-C, LLC, and against Plaintiff Creative Choice Homes XXX, LLC and Impro Synergies, LLC, as follows:

    (a)  All claims of Plaintiff are dismissed with prejudice.

    (b) Judgment is entered in favor of Defendants on their counterclaim, declaring that Plaintiff is removed as general partner effective as of

the date of entry of judgment.

(c) Judgment is entered in favor of Defendants on their counterclaim, declaring that Impro Synergies, LLC's management contract is terminated effective 30 days from the entry of judgment, and it is not required to return to the partnership any funds properly earned through the date of termination.

(2) As to Case No. 8:19-cv-1910, the Clerk is directed to enter judgment in favor of Defendants, MG Affordable Master, LLC, MG GTC Middle Tier I, LLC and MG GTC Fund I, LLC, and against Plaintiff Creative Choice Homes XXXI, LLC and Impro Synergies, LLC, as follows:

(a)  All claims of Plaintiff are dismissed with prejudice.

(b) Judgment is entered in favor of Defendants MG Affordable Master, LLC, and MG GTC Middle Tier I, LLC, on their counterclaim, declaring that Plaintiff is removed as general partner effective as of the date of entry of judgment.

(c) Judgment is entered in favor of Defendants MG Affordable Master, LLC, and MG GTC Middle Tier I, LLC, on their counterclaim, declaring that Impro Synergies, LLC's management contract is terminated effective 30 days from the entry of judgment, and it is not required to return to the partnership any funds properly earned through the date of termination.

(3) Following entry of judgment in each of the two cases, the Clerk is directed to terminate any pending motions and thereafter close the case.

(4) The Court reserves jurisdiction to entertain a motion for fees and non-taxable costs.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 5th day of April, 2022.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**